**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 14, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 14, 2021

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 96783-1 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| RONALD DELESTER BURKE, | ) | |
| | ) | Filed: January 14, 2021 |
| Respondent. | ) | |
| _____ | ) | |

MONTOYA-LEWIS, J.—The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against [them]." U.S. CONST. amend. VI. The confrontation clause is concerned with "'witnesses' against the accused," meaning those who "'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). A person accused of committing a crime has a right to be confronted by those who bear testimony against them. Thus, statements that are made out of court *that are testimonial* cannot be admitted for use against a criminal

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

defendant unless the speaker is unavailable and the defendant had a prior opportunity for cross-examination. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting and citing *Crawford*, 541 U.S. at 53-54, 51). On the other hand, statements that are not testimonial do not implicate the confrontation clause. *Id.* To determine whether a statement is testimonial, we must identify its primary purpose. *State v. Scanlan*, 193 Wn.2d 753, 766, 445 P.3d 960 (2019) (quoting *Ohio v. Clark*, 576 U.S. 237, 245, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015)), *cert. denied*, 140 S. Ct. 834 (2020).

In this case, a patient being treated for a sexual assault made statements to a sexual assault nurse examiner in the course of an exam with both medical and forensic purposes. We hold that under these circumstances, the primary purpose of nearly all of the statements was to guide the provision of medical care, not to create an out-of-court substitute for trial testimony. Thus, the statements were not testimonial, so their admission did not violate the Sixth Amendment. We further hold that the trial court did not abuse its discretion in admitting those statements under the hearsay exception for statements made for purposes of medical diagnosis or treatment. Finally, we hold that the trial court did err in admitting one statement describing the assailant, but the error was harmless. Accordingly, we reverse.

*State v. Burke*
No. 96783-1

## I. FACTS AND PROCEDURAL HISTORY

### A. Factual Background

Around 1:30 a.m. on July 3, 2009, K.E.H. arrived in the emergency department at Tacoma General Hospital. She reported that she had just been raped in nearby Wright Park, where she resided. She was crying and had leaves and grass in her hair. Shortly after she arrived, a social worker called the police to report the rape. Around 3:15 a.m., Officer Khanh Phan arrived at the Tacoma General emergency department and interviewed K.E.H. about the incident. K.E.H. gave a description of the assailant and the location of the assault. After interviewing her, Officer Phan went to the park to look for evidence and possible witnesses or suspects but found no one.

K.E.H. was treated in the emergency department, where she received a CT (computed tomography) scan and blood and urine tests. At about 11:15 a.m., K.E.H. was medically cleared by the emergency department to go on to the sexual assault exam. Sexual assault nurse examiner Kay Frey conducted K.E.H.'s sexual assault exam that afternoon.

DNA (deoxyribonucleic acid) testing revealed spermatozoa on K.E.H.'s underwear that had been collected during the sexual assault exam. In 2011, police matched the DNA on the underwear to Ronald Burke. Burke lived in an apartment near Wright Park in Tacoma in 2009 and admitted to having been to the park.

3

*State v. Burke*
No. 96783-1

However, he denied ever having sex there or getting in a fight with a woman there.

In 2014,[1] Burke was charged with second degree rape by forcible compulsion.

K.E.H. died in 2011.

B.      Procedural History

Burke was tried by a jury in 2016. The State sought to admit statements K.E.H. made to Nurse Frey during the sexual assault examination, relying on the hearsay exception for statements made for purposes of medical diagnosis or treatment. ER 803(a)(4). Burke objected to their admission, contending that the statements were testimonial, so their admission would violate his Sixth Amendment right to confrontation. The court held a hearing on the admissibility of the statements, ultimately ruling that all of the statements qualified as statements for the purpose of medical diagnosis or treatment under ER 803(a)(4) and that they were nontestimonial for purposes of the confrontation clause.

1.      *Hearing on Admissibility of the Statements*

At the hearing, Nurse Frey testified that she was a nurse practitioner and that in 2009 she was working as a sexual assault nurse examiner at Tacoma General, where she provided forensic evaluations and medical care for patients who were victims of sexual assault. She recalled that on July 3, 2009, she arrived at the Tacoma

---

[1] At the time Burke was identified as a suspect in this case, he was incarcerated for a separate offense, and police waited until his appeal for that offense was exhausted before charging him with the rape of K.E.H.

4

General emergency department around 7:00 a.m. to see another patient. When she met K.E.H., Nurse Frey said that she would not be able to see K.E.H. for some time because she needed to see the other patient first, and K.E.H. said she wanted to wait. In the notes from the examination, Nurse Frey indicated that K.E.H. had waited for several hours while Nurse Frey was with another patient "because I don't want him to be out there doing this to someone else." Pretrial Mot. Ex. 19F. Nurse Frey began K.E.H.'s examination around 4:00 p.m. that day.

Describing her duties as a sexual assault nurse examiner, Nurse Frey explained that she would respond to calls from emergency departments "for patients[2] who had presented there with a history of sexual assault, and we went out to whichever hospital called . . . and did the forensic evaluations and medical care for them." 6 Verbatim Transcript of Proceedings (VTP) (Nov. 3, 2016) at 543. She also testified about the purpose of the exam she performed on K.E.H.:

> The purposes are to do the forensic piece: Photographing, taking a history, doing any DNA retrieval that could be done. Another purpose is to provide them with the medical care they need, subsequent to their assault, and provide support and connections for them via advocates and social workers and that kind of thing. So it's to basically manage their case.

*Id.* at 545. Nurse Frey consulted the documents that comprised the sexual assault evaluation, which the court admitted for the purposes of the hearing.

---

[2] We note here she describes those for whom she provides these services as "patients," not "witnesses."

5

*State v. Burke*
No. 96783-1

The sexual assault exam began with a consent form, which K.E.H. signed. The consent form indicated under the "Medical Care" heading that "[a] medical screening examination and care must be provided by an emergency department or primary care provider prior to the forensic evaluation. A forensic evaluation does not include general medical care." Pretrial Mot. Ex. 19B. Nurse Frey explained that this meant patients needed to be "deemed capable of going forward" before beginning the sexual assault exam, where she would provide medication and treatment specific to sexual assault. 6 VTP (Nov. 3, 2016) at 555, 557. Under the heading "Forensic Evaluation," the consent form indicated that physical evidence, such as swabs and blood, may be collected; photographs may be taken and used for legal purposes; medication may be recommended ("including immunizations, anti-nausea medications, emergency contraception and medications to treat sexually transmitted infections"); the forensic nurse examiner may speak to the investigating officer only if the assault had been reported to law enforcement; and the detailed medical records ("photographs, lab results, written documentation") would be kept confidential. Pretrial Mot. Ex. 19B (emphasis omitted). Under the heading "Physical Evidence Disposition," the consent form indicated that all physical evidence collected during the forensic evaluation ("sexual assault kit, clothing") would be released to the agency investigating or prosecuting the assault. *Id.* (emphasis omitted).

6

*State v. Burke*
No. 96783-1

After obtaining K.E.H.'s consent to perform the exam, Nurse Frey took K.E.H.'s patient history, which she recorded "word for word" on the forensic evaluation patient narrative. 6 VTP (Nov. 3, 2016) at 549. Nurse Frey testified that the patient history is

> probably the most important thing.
> . . . .
> . . . Well, this is just medical training in general. History guides everything, and that's true for sexual assault patients as well. So what they tell you, what they can tell you, what they aren't able to tell you, directs you further to what they might need, medically to figure it out.
> . . . .
> . . . Sometimes it governs medications, for example. Sometimes it governs where you might look for injuries more closely; that kind of thing.

*Id.* at 545-46. When Nurse Frey asked K.E.H. what happened in Wright Park, K.E.H. responded:

> I was sitting there rolling myself a cigarette. I know he covered my mouth because I would have been screaming for help. I was taken to the ground. I don't know if he tried choking me or not. The next thing I knew I was taken to the ground, my pants were off and stuff and he was inside me. It was over and done with. I think he told me to keep my mouth shut. That's all I remember, then I came here. I walked over to the hospital.

Pretrial Mot. Ex. 19E; 6 VTP (Nov. 3, 2016) at 612 (Nurse Frey reading K.E.H.'s response from Pretrial Mot. Ex. 19E during the hearing).

Next, Nurse Frey asked K.E.H. specific questions about what she remembered from the assault, according to the patient history protocol. In the patient history forms, she recorded quoted language from K.E.H. describing the location of the

7

*State v. Burke*
No. 96783-1

assault ("close to 6th Avenue [at] a table") and the assailant's appearance ("He was tall, a light black, no hair or short hair. He had a white T-shirt and jeans. No jacket."). Pretrial Mot. Ex. 19C. Nurse Frey also recorded K.E.H.'s answers to questions about penetration, ejaculation, contraception, and her position during the assault ("on the ground on my back"). *Id.* The patient history forms also included K.E.H.'s answers to questions about strangulation ("He put his hand over my mouth."), grasping, grabbing, or holding ("He was laying on me."), intimidation or threat ("To keep my mouth shut & don't report it."), and her pain level, allergies, and postassault hygiene. Pretrial Mot. Ex. 19D. The forms also indicated that K.E.H. was allergic to some pain medications and needed crutches due to arthritis. Nurse Frey testified that the answers to these questions would guide her to look for injuries as well as evidence.[3]

Nurse Frey conducted a general exam and a genital exam, and took photos of and documented K.E.H.'s injuries on the evaluation form. Nurse Frey clarified that while the emergency department provided K.E.H. with general medical care, she provided medications and treatment specifically relating to the sexual assault. She testified that when she examined K.E.H., she discovered a cervical laceration, an unusual injury, that was still bleeding. She was the first medical provider to discover

---

[3] Nurse Frey explained some of the routine and specific treatment she provided during sexual assault exams. For example, she explained that she would prescribe standard medications to most sexual assault patients, but an assault that involved strangulation would trigger specific treatment.

8

*State v. Burke*
No. 96783-1

that injury, and she was concerned that it might require further treatment by an obstetrician-gynecologist.

Finally, Nurse Frey explained that although sexual assault forensic exams are paid for by state and federal crime victims' funds, her salary was paid by the health care organization MultiCare and she did not take any direction from law enforcement regarding the steps she should take in her job. Nurse Frey recalled that K.E.H. had been visited by law enforcement because she wanted to report the rape, but Nurse Frey herself did not meet with law enforcement "in any way" on this case, and no member of law enforcement was present during the exam. 6 VTP (Nov. 3, 2016) at 548.

The court ruled K.E.H.'s statements admissible. Nurse Frey was permitted to testify to the jury about the statements K.E.H. made to her in the course of the sexual assault examination and evaluation.

### 2.    *Trial Testimony*

Before the jury, Nurse Frey testified about her examination of K.E.H. She read K.E.H.'s descriptions of the assault, the location, and the assailant aloud to the jury. She also read K.E.H.'s answers to the targeted questions about penetration, ejaculation, contraception, her position during the assault, and her pain level. She read K.E.H.'s answers about strangulation, grabbing, grasping, or holding, and intimidation as well. She described the injuries she observed during the general

physical exam and the genital exam, including injuries to K.E.H.'s knee, elbow, inner thigh, and internal and external genitalia, and the more serious cervical laceration.

Several police officers testified about the process of identifying Burke as a suspect. A social worker had called the police when K.E.H. arrived at Tacoma General, reporting that K.E.H. had been raped. Officer Phan testified that he interviewed K.E.H. in the early hours of the morning on July 3, 2009. He took her description of the assault and the assailant, and he went to the park to look for anyone fitting that description, but he did not find anyone at all. Detective Christie Yglesias testified that the initial police report contained "a general description [of the assailant], but nothing that would stick out." 8 VTP (Nov. 8, 2016) at 864. She said that initial testing of the sexual assault kit in 2009 revealed a DNA profile, but no matches were found in the crime lab database, and the case remained active, pending further investigation.

Detective Yglesias testified that in May 2011, the crime lab obtained a match between Burke and the DNA profile found on K.E.H.'s underwear. Police obtained a reference DNA sample from Burke to compare with the sample from the sexual assault kit. Forensic DNA analyst Dr. Kelli Byrd testified extensively about the process of testing and matching the DNA in this case. The forensic lab identified spermatozoa on the underwear in the sexual assault kit. It found that Burke could not

10

*State v. Burke*
No. 96783-1

be excluded as a contributor to the DNA from the sample and that the chances of someone else matching the sample to the degree Burke matched were 1 in 170 quadrillion.[4]

The jury found Burke guilty of rape in the second degree by forcible compulsion. The trial court imposed legal financial obligations in the judgment and sentence, although it found that Burke was indigent and would not be able to pay nonmandatory fines or costs. It ordered him to pay restitution and a crime victim assessment, as well as a $100 DNA collection fee and a $200 criminal filing fee, with interest to accrue on the legal financial obligations.

Burke appealed. He argued that (1) K.E.H.'s statements to Nurse Frey were testimonial, so their admission violated his right to confrontation, and (2) the statements did not qualify as statements made for the purpose of medical diagnosis under ER 803(a)(4). Although *Scanlan*, 193 Wn.2d at 761, had not yet been decided, the Court of Appeals applied the primary purpose test for the confrontation clause issue, as articulated in *Clark*, 576 U.S. at 244-46, and *Davis*, 547 U.S. at 822. *State v. Burke*, 6 Wn. App. 2d 950, 953, 431 P.3d 1109 (2018). The Court of Appeals held that all of K.E.H.'s statements to Nurse Frey were testimonial, their admission violated the confrontation clause, and the error was not harmless. *Id.* Burke had also

---

[4] Burke did not challenge the DNA evidence or any testimony other than Nurse Frey's on appeal.

11

*State v. Burke*
No. 96783-1

sought to have certain legal financial obligations stricken from the judgment and sentence. The State agreed that Burke was indigent and that his DNA had been previously collected as a result of a prior conviction, so the DNA collection fee, the criminal filing fee, and the interest provision should be stricken. However, because the Court of Appeals reversed on the confrontation clause issue, it did not reach the ER 803(a)(4) or legal financial obligation issues. *Id.* at 973 & n.9.

The State sought this court's review, which we granted. 194 Wn.2d 1009 (2019).

## II. ANALYSIS

### A. Confrontation Clause

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.[5] The confrontation clause prohibits the admission of testimonial statements unless the declarant is unavailable and the defendant had a

---

[5] *See also Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (incorporating the confrontation clause to the states). Burke refers to the right to confrontation contained in both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. However, he fails to present an independent analysis of the right under our state constitution. Therefore, our analysis is limited to the federal constitution. *See Scanlan*, 193 Wn.2d at 773-74 (Gordon McCloud, J., concurring); *see also Burke*, 6 Wn. App. 2d at 963 n.2.

12

*State v. Burke*
No. 96783-1

prior opportunity for cross-examination. *Crawford*, 541 U.S. at 59. Review of confrontation clause challenges is de novo. *Scanlan*, 193 Wn.2d at 761.

Only statements that are testimonial implicate the confrontation clause. *Davis*, 547 U.S. at 821. The confrontation clause speaks to "'witnesses' against the accused," meaning those who "'bear testimony,'" which is "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford*, 541 U.S. at 51 (alteration in original) (quoting 2 WEBSTER, *supra*). Declining to define the precise scope of "testimonial" statements, the *Crawford* Court explained that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial[,] and to police interrogations." *Id.* at 68.

In the years following *Crawford*, the United States Supreme Court articulated what became known as the primary purpose test to determine whether out-of-court statements are testimonial.[6] In *Davis*, the Court explained that statements "are testimonial when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822. The primary purpose test applies to all statements that implicate the confrontation clause, regardless of to whom they are made. *Scanlan*, 193 Wn.2d at 763-66; *see, e.g., id.* at 766 (medical providers); *Clark*,

---

[6] See *Scanlan*, 193 Wn.2d at 761-66, for a review of the origins of this test.

13

*State v. Burke*
No. 96783-1

576 U.S. at 246 (preschool teachers); *State v. Beadle*, 173 Wn.2d 97, 109-10, 265 P.3d 863 (2011) (law enforcement).

Courts must determine the primary purpose of an interrogation "by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Michigan v. Bryant*, 562 U.S. 344, 370, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). When the primary purpose of questioning is to respond to an ongoing emergency, for example, "its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 358. Thus, to determine whether the primary purpose of the statements is to create an out-of-court substitute for trial testimony, we must objectively evaluate the statements and actions of both the declarant and the individual who hears the statements in light of the circumstances in which their conversation occurred.

Statements are testimonial when they are made to establish past facts in order to investigate or prosecute a crime. For example, statements are testimonial when they are made in formal police interrogations. *See Crawford*, 541 U.S. at 52. Less formal statements to police officers can also be testimonial. Statements to police responding to a 911 call were testimonial when the declarant described past events

14

*State v. Burke*
No. 96783-1

in the presence of police officers in order to help them investigate a crime and it was clear the declarant was in no immediate danger. *See Davis*, 547 U.S. at 829-30; *State v. Koslowski*, 166 Wn.2d 409, 430, 209 P.3d 479 (2009). Similarly, statements that a victim of child molestation made to police were testimonial when the interview took place months after the abuse had ended and the perpetrator had been removed from the home. *Beadle*, 173 Wn.2d at 109-10. Although a Child Protective Services (CPS) worker was present during the interview, the immediate danger to the declarant had passed. *Id.* The CPS worker was "present only to assist the police department" in obtaining evidence from a traumatized child—"not to protect [the child's] welfare in her capacity as a CPS employee"—and the primary purpose of the statements was to establish or prove past facts for use in a criminal prosecution. *Id.*

On the other hand, statements are nontestimonial when they have another primary purpose. Statements made to assist police in addressing an ongoing emergency is a well-established nontestimonial purpose. For example, frantic statements to a 911 emergency operator describing the identity of an assailant in a domestic disturbance *in progress* were nontestimonial because the declarant was seeking help in the face of immediate danger. *Davis*, 547 U.S. at 827. Statements made by a man bleeding from a gunshot wound, describing the shooter and the location of the shooting to police responding to radio dispatch, were nontestimonial

15

*State v. Burke*
No. 96783-1

because there was an ongoing emergency endangering the public at large. *Bryant*, 562 U.S. at 374-78.

The role of the person the declarant is speaking to is significant to determining the primary purpose of a statement. *Clark*, 576 U.S. at 249 ("Courts must evaluate challenged statements in context, and part of that context is the questioner's identity."). A person "who makes a formal statement to government officers bears testimony in a sense that a person who makes" statements in other contexts does not. *Crawford*, 541 U.S. at 51. Law enforcement officers are "principally charged with uncovering and prosecuting criminal behavior"; thus, statements made to them are much more likely to be used as a substitute for trial testimony. *Clark*, 576 U.S. at 249. Additionally, a person conducting an interrogation *for* the police may be considered an agent of the police for purposes of the confrontation clause. *See, e.g.*, *Davis*, 547 U.S. at 823 n.2.[7]

Statements made to witnesses other than law enforcement officers are far more likely to be made for reasons not primarily associated with criminal prosecution. Statements are nontestimonial when their primary purpose is to guide the provision of medical care or to determine whether a person responsible for the

---

[7] Without deciding whether the acts of 911 operators are in fact acts of police, the *Davis* Court analyzed statements made to a 911 operator as statements made to law enforcement personnel, reasoning that "[i]f 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers." 547 U.S. at 823 n.2.

16

declarant's safety should permit them to leave. For example, a child's statement to his preschool teacher describing abuse and his abuser were nontestimonial because the teacher needed to determine whether it was safe to release him to go home with his guardian. *Clark*, 576 U.S. at 246-47. As we explained in *Scanlan*, statements to medical providers "are 'significantly less likely to be testimonial than statements given to law enforcement officers' because medical personnel are 'not principally charged with uncovering and prosecuting criminal behavior.'" *Scanlan*, 193 Wn.2d at 767 (quoting *Clark*, 576 U.S. at 249). There, a domestic violence victim described the cause of his injuries to emergency and follow-up medical providers. *Id.* at 758-60. Those statements were nontestimonial because both sets of medical providers needed to understand how to treat the injuries. *Id.* at 768. The victim's statements identifying his girlfriend as the assailant were similarly nontestimonial because the medical providers needed to know whether he would be safe upon discharge. *Id.* at 768-69.

### 1. *Nontestimonial Statements*[8]

Objectively viewing the statements and actions of K.E.H. and Nurse Frey in light of the circumstances of a sexual assault exam, we hold that nearly all of K.E.H.'s statements were nontestimonial. A sexual assault exam contains both

---

[8] For purposes of determining whether the statements were admissible, the facts are limited to those presented at the admissibility hearing.

forensic and medical purposes, and some statements may be more relevant to one purpose than another. However, the confrontation clause requires us to identify a singular dominant purpose to determine whether statements are testimonial. *Davis*, 547 U.S. at 822. Therefore, we must "objectively evaluate[] the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs," to determine the primary purpose of statements made to a sexual assault nurse examiner. *Bryant*, 562 U.S. at 370. We hold that nearly all of K.E.H.'s statements were nontestimonial because their primary purpose was to guide the provision of medical care.

Nurse Frey's role as a sexual assault nurse examiner requires us to determine whether she was principally acting as a medical provider or as someone charged with uncovering and prosecuting criminal behavior when she elicited these statements from K.E.H. *Scanlan*, 193 Wn.2d at 767; *Clark*, 576 U.S. at 249. The role of sexual assault nurse examiner shares features with both medical providers and law enforcement because the nurse's duties are to provide medical care *and* to collect evidence. However, we do not believe that sexual assault nurse examiners are "*principally* charged with uncovering and prosecuting criminal behavior." *Clark*, 576 U.S. at 249 (emphasis added).[9]

---

[9] Other jurisdictions have split on whether the connection to investigating officers or the provision of medical care dictates the primary purpose of a forensic sexual assault exam in a particular factual scenario. *See State v. Hill*, 236 Ariz. 162, 167, 336 P.3d 1283 (Ariz. Ct. App.

*State v. Burke*
No. 96783-1

Sexual assault nurse examiners are medical professionals with specialized evidence-collecting skills and training that supplement their medical training.[10] But this specialization does not transform a class of medical professionals into agents of the police, nor does it mean that their duty to provide medical care becomes a lower priority than their evidence-collecting responsibilities. Sexual assault nurse examiner programs emerged in the 1970s as "nurses, other medical professionals, counselors, and advocates working with rape victims in hospitals, clinics, and other settings . . . recognized that services to sexual assault victims were inadequate and not at the same high standard of care for other [emergency department] clients."

LINDA E. LEDRAY, SEXUAL ASSAULT RES. SERV., SEXUAL ASSAULT NURSE

---

2014) ("Because forensic medical examinations often have two purposes—to gather evidence for a criminal investigation and to provide medical care to the victim—whether a victim's statement in response to a question by the examiner is testimonial for purposes of the Confrontation Clause turns on whether the surrounding circumstances, objectively viewed, show that the primary purpose of the exchange at issue was to provide medical care or to gather evidence."); *Thompson v. State*, 2019 OK Cr 3, ¶12, 438 P.3d 373, 377 (collecting cases), *cert. denied*, 140 S. Ct. 171 (2019).

[10] WASH. STATE DEP'T OF COMMERCE, SEXUAL ASSAULT RESPONSE: INCREASING SEXUAL ASSAULT NURSE EXAMINER AVAILABILITY AND ACCESS STATEWIDE 14 (2019) (hereinafter SEXUAL ASSAULT RESPONSE) [https://perma.cc./BWR6-V5KX]; *see also* Linda A. Hutson, *Development of Sexual Assault Nurse Examiner Programs*, 37 NURSING CLINICS OF N. AM. 79, 79 (2002) ("A sexual assault nurse examiner (SANE) is a registered nurse (RN) specially trained in the comprehensive care of the survivor of sexual assault."). Linda E. Ledray & Sherry Arndt, *Examining the Sexual Assault Victim: A New Model for Nursing Care*, 32 J. PSYCHOSOCIAL NURSING & MENTAL HEALTH SERVS. 7, 11-12 (1994) ("The role of the nurse examiner goes far beyond collecting forensic evidence that will be useful should the case go to court. Her role involves providing comprehensive care for the survivor and working cooperatively with other individuals in the legal system. The forensic nurse working in this role is uniquely qualified to provide the comprehensive care necessary to the sexual assault survivor. Treating injuries, preventing pregnancy from occurring or proceeding, and preventing the contraction of a sexually transmitted disease from the rape helps reduce secondary injury. Crisis intervention and supportive counseling help the victim move toward recovery and survivor status.").

19

State v. Burke
No. 96783-1

EXAMINER (SANE) DEVELOPMENT & OPERATION GUIDE 5 (1999) [https://perma.cc/75M7-6SNC]. Patients who were victims of sexual assault often had to wait for hours in busy, public areas because their injuries were viewed as less serious than those of other trauma patients. *Id.* Medical providers were not sufficiently trained to perform "medical-legal" exams or provide expert witness testimony. *Id.* Additionally, these patients were often retraumatized by the process of the exam and by the way they were treated by the medical providers. *Id.* ("Even when the victim's medical needs were met, their emotional needs all too often were overlooked, or even worse, the victim was blamed for the rape by the [emergency department] staff." (citations omitted)); Linda A. Hutson, *Development of Sexual Assault Nurse Examiner Programs*, 37 NURSING CLINICS OF N. AM. 79, 79 (2002).

Today, sexual assault nurse examiners "receive specialized training in forensic evidence collection, sexual assault trauma response, forensic techniques using special equipment, expert-witness testimony, assessment and documentation of injuries, identifying patterned injury, and maintenance of chain of evidence." Debra Patterson, Rebecca Campbell & Stephanie M. Townsend, *Sexual Assault Nurse Examiner (SANE) Program Goals and Patient Care Practices*, 38 J. NURSING SCHOLARSHIP 180, 181 (2006) (hereinafter *SANE Program Goals*). They are responsible for conducting sexual assault exams, "including crisis intervention, STD prevention, pregnancy risk evaluation and interception, collection of forensic

20

*State v. Burke*
No. 96783-1

evidence, and referrals for additional support and care." LEDRAY, *supra*, at 11. Though documenting and collecting evidence are some of the critical responsibilities of a sexual assault nurse examiner, so is providing medical care.[11] Sexual assault nurse examiners provide medical care specific to sexual assault regardless of whether or not the patient wishes to report the crime to police. *Id.* at 11-12; SEXUAL ASSAULT RESPONSE, *supra*, at 16-17.

In this case, Nurse Frey testified that her duties as a sexual assault nurse examiner were twofold: both to collect evidence *and* to provide medical care. At the hearing, Nurse Frey testified about her background in medicine as well as her duties as a sexual assault nurse examiner. She described those duties as providing forensic evaluations and medical care for patients who presented with a history of sexual assault. She explained that, according to her medical training, taking the patient's history is the "most important thing" for treating patients—including "sexual assault patients"—because it guides the medical provider in determining where to look for injuries and what medication is appropriate. 6 VTP (Nov. 3, 2016) at 545-46. Nurse Frey followed protocols to collect and preserve physical samples, but she did not take any direction from law enforcement regarding the steps she should take in the

---

[11] SEXUAL ASSAULT RESPONSE, *supra*, at 9 ("Sexual assault response is an issue of both public health and criminal justice: It is important that patients receive adequate treatment for their physical and mental injuries, victims receive justice and perpetrators are prosecuted for their crimes." (emphasis omitted)); *see also SANE Program Goals* at 181-82 ("'providing high quality medical care' was rated as a primary program goal" by 90 percent of participating programs).

21

*State v. Burke*
No. 96783-1

exam, and no member of law enforcement was present during the exam. *Cf. Beadle*,

173 Wn.2d at 109 & n.10 (CPS worker was present during police interrogation "*only*

*to assist the police department*—not to protect [the child's] welfare in her capacity

as a CPS employee" (emphasis added)). Finally, although the exam itself was paid

for by state and federal crime victims' compensation funds,[12] Nurse Frey was

employed and paid by a health care organization; she was not paid with

governmental funds. Thus, Nurse Frey's forensic duties did not subordinate her

medical responsibilities but, rather, supplemented them.

Under these circumstances, we decline to hold that a sexual assault nurse

examiner acts as an agent of police. Instead, we view Nurse Frey as a medical

provider, to whom statements "are 'significantly less likely to be testimonial than

---

[12] *See* RCW 7.68.170 (prohibiting hospitals for billing or charging costs of sexual assault exams to the victim of the assault when the examination is performed for the purposes of gathering evidence of possible prosecution); WAC 296-30-170 (costs must be billed to the crime victims compensation program). The medical forensic evaluation is also used as evidence to verify that the medical care was provided to treat an injury resulting from a criminal act, which is necessary to determine whether medical care can be paid for by the crime victims compensation program. WAC 296-30-010. The concurrence and amicus curiae suggest that because the exam had to be billed to the crime victims compensation program, Nurse Frey must have represented that gathering evidence was the sole purpose of the exam. As discussed above, it is not clear that the forensic component overrides the medical treatment component of a sexual assault forensic exam (either in general or in this specific case). Moreover, whether RCW 7.68.170 and WAC 296-30-170 limit billing the State for sexual assault exams to only those exams whose primary or sole purpose is to gather evidence for prosecution is not a question squarely before us. In any event, we do not think that the intricacies of medical billing systems can be determinative of whether statements a sexual assault patient makes to a medical professional specializing in sexual assault exams are testimonial for purposes of the confrontation clause of the Sixth Amendment. While relevant to the inquiry, the funding structure of the exam does not determine the primary purpose of the statements made in the course of the exam.

22

*State v. Burke*
No. 96783-1

statements given to law enforcement officers' because medical personnel are 'not *principally* charged with uncovering and prosecuting criminal behavior.'" *Scanlan*, 193 Wn.2d at 767 (emphasis added) (quoting *Clark*, 576 U.S. at 249).

Burke argues that K.E.H.'s statements should be viewed as testimonial because Nurse Frey was not gathering information in response to an ongoing emergency. However, our inquiry does not turn on the existence of an ongoing emergency for two reasons. First, since Nurse Frey was not acting as law enforcement, the primary purpose of the statements is not limited to either creating testimony or addressing an ongoing emergency. "[T]he existence of an 'ongoing emergency' at the time of an encounter between an individual *and the police* is among the most important circumstances informing the 'primary purpose' of an interrogation." *Bryant*, 562 U.S. at 361 (emphasis added). The existence of an ongoing emergency is often an indicator that a statement to *law enforcement* (or its agents) is nontestimonial. *See, e.g.*, *id.* at 374-78 (police responding to radio dispatch); *Davis*, 547 U.S. at 827 (911 operator). *But see Clark*, 576 U.S. at 246 (preschool teachers). Statements made to police are often made under circumstances that would lead an objective declarant to believe that they would be used to prove past facts at trial, or else under circumstances evincing an ongoing emergency that police are necessary to resolve. *See, e.g.*, *Crawford*, 541 U.S. at 52; *Bryant*, 562 U.S.

at 375-76. However, when declarants speak to someone other than law enforcement, there may be a multitude of purposes for the statements.

Second, "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry," and "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 374, 358. For example, in *Scanlan*, we held that none of a domestic violence victim's statements to his medical providers were testimonial: some were made to determine whether there was an ongoing emergency, while others were made for medical purposes. 193 Wn.2d at 768-69. The patient's statements identifying his assailant "were elicited by 'questions . . . meant to identify the abuser in order to protect the victim from future attacks.'" *Id.* (alteration in original) (quoting *Clark*, 576 U.S. at 247). The medical providers needed to know the identity of the assailant to determine whether the patient would be safe upon discharge or whether he needed referrals for social services. *Id.* at 759-60. This was true in the contexts of both emergency and follow-up treatment. *Id.* Moreover, the "statements to medical providers describing the cause of his injuries were elicited for the purpose of obtaining medical treatment." *Id.* at 768. Several of the medical providers testified that they needed to know how the patient's injuries occurred in order to determine how serious the injuries were, whether they were related to underlying medical conditions, and

whether the medical providers needed to take measures to prevent new or recurring injuries. *Id.* at 759-60. *Scanlan* makes clear that obtaining medical treatment is a nontestimonial primary purpose, distinct from an ongoing emergency.

The circumstances and K.E.H.'s statements indicate that nearly all of the statements were made primarily for medical purposes. K.E.H. made these statements in a medical exam room in a hospital. She needed medical treatment specific to her sexual assault, which Nurse Frey provided. Although K.E.H. had been medically cleared from the emergency department, this did not mean that she was no longer in need of *any* medical treatment. Instead, she was no longer in need of *emergency* medical treatment and was cleared to go on to the next step for her: the sexual assault exam. While some patients in this situation may choose to leave the hospital and not attend this exam, it is uncontroverted that this is part of the process of treating a sexual assault patient. This was this patient's next step, and the fact that the hospital did not have the staff to address this step immediately does not mean the statement was nonmedical in purpose. Additionally, while the consent form K.E.H. signed indicated that *general* medical care would not be provided during the sexual assault exam, Nurse Frey did provide treatment and prescribe medication *specific* to the sexual assault during her exam. In fact, Nurse Frey discovered the cervical laceration that the emergency physician had not discovered during K.E.H.'s general medical treatment earlier in the day.

Most of K.E.H.'s statements had either two purposes (medical and forensic) or an exclusive medical purpose. For example, questions about contraception and ejaculation indicated whether and where DNA evidence might be collected, but they were also necessary to determine whether the patient needed medication to treat sexually transmitted infections or prevent pregnancy. Additionally, while the possibility of strangulation and the patient's position during the assault indicated the degree of force (which would bear on what crime the perpetrator could be charged with), that information also revealed where the patient had additional injuries that needed treatment. K.E.H. also talked about missing crutches that she needed to walk (due to arthritis, not due to an injury incurred during the assault) and answered questions about allergies to medications—matters that were certainly relevant to medical treatment but unrelated to the sexual assault. K.E.H.'s account of the assault was part of the patient history, and Nurse Frey testified that she always started with an open-ended question about what happened because patient history is "the most important thing," according to her *medical* training. 6 VTP (Nov. 3, 2016) at 545.

Further, the consent form K.E.H. signed at the beginning of the exam indicated that medical records of the exam, including "photographs, lab results, [and] written documentation" would be kept confidential. Pretrial Mot. Ex. 19B (emphasis omitted). K.E.H.'s statements were contained in the written documentation, which would remain confidential; they were not part of the physical evidence, which would

26

be released to police. The patient history that Nurse Frey described as the most important aspect of medical treatment was among the written records that would remain confidential. Regardless of the forensic purposes for taking swabs and collecting clothing, the primary purpose of eliciting nearly all of the *statements* K.E.H. made during the course of the exam was to guide the medical exam; the statements were used to create the documentation, which would become part of the highly confidential medical records.

Together, K.E.H.'s and Nurse Frey's statements and actions in the context of a sexual assault exam indicate that the primary purpose of nearly all of K.E.H.'s statements was not to provide an out-of-court substitute for trial testimony but to guide medical treatment for sexual assault. Statements patients make to medical providers "are 'significantly less likely to be testimonial than statements given to law enforcement officers' because medical personnel are 'not principally charged with uncovering and prosecuting criminal behavior.'" *Scanlan*, 193 Wn.2d at 767 (quoting *Clark*, 576 U.S. at 249). It is not the nurse's *principal* duty to uncover and prosecute criminal behavior, even when they are tasked with collecting evidence as part of their specialized training. The statements were made in a hospital exam room, not a police station. No member of law enforcement was present during the exam, and Nurse Frey did not take any direction from law enforcement. Additionally, Nurse Frey provided medical care specific to sexual assault. Finally, these

statements were elicited for both medical and forensic purposes, if not exclusively medical purposes. Nearly every statement K.E.H. made during the exam was necessary to guide the medical component in the exam, and their primary purpose was not to create an out-of-court substitute for trial testimony. Under these circumstances, most of K.E.H.'s statements cannot be characterized as primarily testimonial. With the exception of one statement describing the assailant (discussed below), we hold that the primary purpose of K.E.H.'s statements during the sexual assault exam was to receive medical care. Thus, the statements were nontestimonial and their admission did not violate the confrontation clause.

2.     *Testimonial Statement*

"[A] conversation could contain both testimonial and nontestimonial statements." *Koslowski*, 166 Wn.2d at 419 (citing *Davis*, 547 U.S. at 828). "[T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements . . . become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Davis*, 547 U.S. at 829. In this case, K.E.H. made both testimonial and nontestimonial statements during the course of the sexual assault exam. Most of K.E.H.'s statements did not implicate the confrontation clause, but the trial court erred in admitting the one that did.

*State v. Burke*
No. 96783-1

One statement was testimonial. One of the questions Nurse Frey asked when taking K.E.H.'s patient history sought a "description of assailant(s)." Pretrial Mot. Ex. 19C. Nurse Frey read K.E.H.'s answer to the jury, which described the assailant's appearance and clothing. Although this question could conceivably elicit answers designed to address patient safety, rather than information that would assist police in investigating or prosecuting a crime,[13] that was not the case here. K.E.H. gave no indication that she knew the attacker. Her answer to that question did not provide guidance for medical treatment, other than to rule out a potential concern for her safety. K.E.H.'s description of the assailant more closely resembles a statement one might make in a police interrogation (to assist law enforcement in identifying and apprehending a suspect) or at trial (to identify the defendant as the assailant). K.E.H. described the assailant's height, skin color, and clothing—facts that had no bearing on her injuries but would be highly relevant to identifying the person responsible for the rape for further prosecution.

---

[13] For example, Nurse Frey testified that as a sexual assault nurse examiner, she sometimes saw victims of domestic violence, for whom she would also provide medical care and forensic evaluations. If a patient described the assailant as an acquaintance or romantic partner, the medical provider would be on alert about a potential continued danger to the patient and might help the patient arrange for a safe place to go after discharge. *See Clark*, 576 U.S. at 246-47; *Scanlan*, 193 Wn.2d at 768-69. When a sexual assault patient describes the assailant as an intimate partner, the statement's primary purpose might be to guide the provision of medical care or to address an ongoing emergency regarding the patient's safety upon discharge. *See, e.g.*, *Scanlan*, 193 Wn.2d at 768-69; *see also Bryant*, 562 U.S. at 368 ("Victims are also likely to have mixed motives when they make statements to police. During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant. A victim may want the attacker to be incapacitated temporarily or rehabilitated.").

29

K.E.H.'s statement describing the assailant was testimonial. Its primary purpose was not to guide the medical exam but to identify the person who could be prosecuted for the sexual assault. The trial court erred in admitting this statement. However, as discussed below, that error was harmless.

B.     Harmless Error

The admission of K.E.H.'s description of the assailant was erroneous but harmless. Under the constitutional harmless error standard, the State has the burden of establishing harmless error beyond a reasonable doubt. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). The error is harmless "[i]f the untainted evidence is so overwhelming that it necessarily leads to a finding of the defendant's guilt." *Koslowski*, 166 Wn.2d at 431.

K.E.H.'s description of the assailant was relevant only to identifying Burke as the person who raped her, but it was cumulative evidence of Burke's identity. Officer Phan testified that K.E.H. had given him a description of the assailant early in the morning on July 3, 2009, shortly after the assault. He went straight to the park to investigate the scene and look for witnesses or someone matching her description, but he found no one.

Burke was identified as a suspect years later, when the crime lab identified a match between his DNA and the sample collected from K.E.H.'s underwear. The forensic DNA analyst testified extensively about the process of testing and matching

DNA. She testified that the chances of someone other than Burke contributing the male DNA found on K.E.H.'s underwear was 1 in 170 quadrillion. Even without K.E.H.'s testimonial description of the assailant, the untainted DNA evidence identifying Burke as the person who sexually assaulted her was overwhelming.

Although K.E.H.'s description of the assailant was testimonial, it was harmless error to admit it.

C.      Statements Made for the Purpose of Medical Diagnosis or Treatment

Burke also argues that K.E.H.'s statements to the sexual assault nurse examiner should not have been admitted because they were hearsay and did not fall under the exception for statements made for the purpose of medical diagnosis or treatment. When a statement is nontestimonial, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 359; *see also, e.g.*, *Crawford*, 541 U.S. at 40 (noting that the State had invoked ER 804(b)(3) for statements against interest); *State v. Ohlson*, 162 Wn.2d 1, 9-10, 168 P.3d 1273 (2007) (excited utterances). In order for K.E.H.'s statements to be admissible, they must be nontestimonial *and* comply with the rules of evidence.

An out-of-court statement used to prove the truth of the matter asserted is inadmissible hearsay under the rules of evidence unless an exception applies. ER 801(c), 802. Statements made for the purposes of medical diagnosis or treatment are

*State v. Burke*
No. 96783-1

an exception to the bar on hearsay. ER 803(a)(4) (allowing statements "describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment").

Unlike the objective primary purpose test for the confrontation clause, the test for statements made for medical diagnosis or treatments considers the subjective purposes of both the declarant and the medical professional. *Compare Bryant*, 562 U.S. at 360, *with State v. Doerflinger*, 170 Wn. App. 650, 664, 285 P.3d 217 (2012). For the statement to be "reasonably pertinent" to medical diagnosis or treatment under ER 803(a)(4), the declarant's motive in making the statement must be to promote treatment and the medical professional must have relied on it for the purposes of treatment. *Doerflinger*, 170 Wn. App. at 664. Statements attributing fault are generally inadmissible under this exception, but statements "disclosing the identity of a closely-related perpetrator" may be reasonably pertinent to treatment in certain situations like domestic violence or sexual abuse "because part of reasonable treatment and therapy is to prevent recurrence and future injury." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007).

We review evidentiary rulings for abuse of discretion. *Ohlson*, 162 Wn.2d at 7-8. "We will not reverse the trial court's decision 'unless we believe that no

*State v. Burke*
No. 96783-1

reasonable judge would have made the same ruling.'" *Id.* at 8 (quoting *State v. Woods*, 143 Wn.2d 561, 595-96, 23 P.3d 1046 (2001)).

The trial court did not abuse its discretion in admitting most of K.E.H.'s statements as reasonably pertinent to medical diagnosis or treatment. It is reasonable to believe that K.E.H.'s motive was to promote treatment and that Nurse Frey relied on the statements for the purposes of treatment. K.E.H.'s statements about her pain level, allergies to medication, and need for her crutches had no other purpose than to receive medical treatment. Her answers to the questions about penetration, ejaculation, contraception, strangulation, grabbing, and her position during the assault were also likely motivated by a desire to promote medical treatment specific to sexual assault. Nurse Frey reviewed the consent agreement with K.E.H. at the beginning of the exam, which explained the dual purposes of the exam and provided that written documentation would remain confidential. K.E.H.'s description of the assault was an answer to the first question Nurse Frey asked when they began the sexual assault exam. Medical professionals often ask patients how their injuries are caused, *see Scanlan*, 193 Wn.2d at 768, and it is reasonable to believe that K.E.H. understood the question "Can you tell me what happened in Wright Park?" to be the starting point for a medical exam. Pretrial Mot. Ex. 19E. Similarly, K.E.H.'s description of the location of the assault was necessary to explain how she arrived at the hospital in the middle of the night after the assault without her crutches: she was

*State v. Burke*
No. 96783-1

unhoused and had been residing in Wright Park, only one block away from Tacoma General.

Additionally, Nurse Frey relied on K.E.H.'s answers for the purposes of medical treatment. As she testified, the specific questions she asked K.E.H. guided the exam. Based on K.E.H.'s answers to these questions, Nurse Frey did not prescribe medication K.E.H. was allergic to and she examined K.E.H. consistent with the specific sexual assault acts K.E.H. reported.

A reasonable judge could have concluded that K.E.H.'s motive in making these statements was to promote medical treatment and that Nurse Frey relied on the statements to provide medical treatment. The trial court did not abuse its discretion in admitting these statements as statements made for the purpose of medical diagnosis or treatment.

The court did abuse its discretion in admitting K.E.H.'s description of the assailant under this exception. There is no evidence to suggest that K.E.H.'s description of her assailant was made to promote medical treatment. Although Nurse Frey sometimes treated victims of domestic violence and could have relied on K.E.H.'s description to rule out the continued danger of intimate partner violence, K.E.H. did not seem to know the assailant.[14] In cases where statements attributing

---

[14] *See State v. Price*, 126 Wn. App. 617, 640, 109 P.3d 27 (2005) (holding that statements a woman made to a doctor, identifying her boyfriend as the person who strangled her, were admissible under ER 804(a)(4) because "a statement attributing fault to an abuser can be

*State v. Burke*
No. 96783-1

fault have been admitted under this exception, the declarant disclosed "the identity of a closely-related perpetrator" who might cause future injury. *Williams*, 137 Wn. App. at 746 (citing *State v. Ackerman*, 90 Wn. App. 477, 482, 953 P.2d 816 (1998); *State v. Sims*, 77 Wn. App. 236, 239, 890 P.2d 521 (1995)). Here, there is no evidence that K.E.H. was motivated to identify a closely related perpetrator who might pose a continued danger to her; her description of the assailant is more like a general attribution of fault, which is not reasonably pertinent to medical diagnosis or treatment. The court abused its discretion in admitting this statement under ER 803(a)(4). However, as explained above, this error was harmless because Burke's identity was established through DNA evidence.

D.     Legal Financial Obligations

Finally, Burke seeks to have several legal financial obligations stricken from his sentence, in light of 2018 amendments to the statutes governing legal financial obligations and this court's decision in *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018). Engrossed Second Substitute House Bill 1783, 65th Leg., Reg. Sess.

---

reasonably pertinent to treatment in domestic assault cases. A physician's treatment will necessarily differ when the abuser is a member of the victim's family or household; for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove himself or herself from the dangerous environment by leaving the home and seeking shelter elsewhere" (citation omitted) (citing *State v. Sims*, 77 Wn. App. 236, 239, 890 P.2d 521 (1995))), *abrogated on other grounds by State v. Hampton*, 184 Wn.2d 656, 665, 361 P.3d 734 (2015). For similar reasons as discussed under our confrontation clause analysis, *see supra* note 13, the relationship between the declarant and the assailant may affect the applicability of this hearsay exception.

(2018) (House Bill 1783) "eliminates interest accrual on the nonrestitution portions of LFOs, it establishes that the DNA database fee is no longer mandatory if the offender's DNA has been collected because of a prior conviction, and it . . . prohibits imposing the $200 filing fee on indigent defendants." *Ramirez*, 191 Wn.2d at 747 (citing LAWS OF 2018, ch. 269, §§ 1, 18, 17). House Bill 1783 became effective on June 7, 2018, and it applies to legal financial obligations imposed on criminal defendants whose cases were not yet final when these amendments were enacted. *Id.* Burke's judgment and sentence ordered him to pay a $200 criminal filing fee and a $100 fee for the collection of DNA, plus interest on these legal financial obligations. However, the trial court found Burke to be indigent, and his DNA had, in fact, previously been collected. Thus, the filing fee, the DNA fee, and the interest provision are no longer authorized for this case, which was still pending when House Bill 1783 was enacted. Accordingly, we remand to the trial court to amend the judgment and sentence to strike the requirements to pay the $200 criminal filing fee and the $100 DNA collection fee, and to amend the interest provisions to reflect that interest will not accrue on nonrestitution legal financial obligations after June 7, 2018.

## III. CONCLUSION

The confrontation clause of the Sixth Amendment protects the right of the accused to be confronted with witnesses against them, but only out-of-court

*State v. Burke*
No. 96783-1

statements that are testimonial implicate this right. Under the circumstances of this sexual assault exam, nearly all of K.E.H.'s statements to the sexual assault nurse examiner were nontestimonial; those statements do not implicate the confrontation clause. Only her description of the assailant was testimonial, but the error in admitting that statement was harmless. Further, the trial court did not abuse its discretion in admitting the majority of the statements as statements made for the purpose of medical diagnosis or treatment, and the error in admitting K.E.H.'s description of the assailant under that hearsay exception was likewise harmless. We reverse the Court of Appeals and remand to the trial court for further proceedings in accordance with this opinion.

*State v. Burke*
No. 96783-1

Montoya-Lewis, J.

WE CONCUR:

Gonzmález, C.J.

Stephens, J.

Johnson, J.

Yu, J.

Owens, J.

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

No. 96783-1

GORDON McCLOUD, J. (concurring)—Nurses are health care

professionals. Nurses "promot[e] and maintain[] health."[1] Sexual assault nurse

examiners (SANEs) discharge such nursing duties.

But SANEs also perform forensic duties. "Forensic" means "pertaining to,

connected with, or used in courts of law . . . ."[2] In this case, that "connect[ion] with

. . . courts of law" was clear from the evidence: the SANE conducted an exam that

was funded (pursuant to ch. 7.68 RCW) by a state victims compensation fund,

sought evidence that could support a criminal prosecution, and had a patient who

stayed for the exam for the specific purpose of providing such forensic evidence to

aid law enforcement. As a result, the patient—K.E.H.—believed, quite rightly,

---

[1] MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/nurse (last visited Jan. 8, 2021); *see also What Is Nursing?*, AM. NURSES ASS'N, https://www.nursingworld.org/practice-policy/workforce/what-is-nursing/ (last visited Jan. 8, 2021).

[2] DICTIONARY.COM, https://www.dictionary.com/browse/forensic# (last visited Jan. 8, 2021); *see also* MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/forensic ("forensic" means "belonging to, used in, or suitable to courts of judicature") (last visited Jan. 8, 2021).

1

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

that her medical care was basically over after her initial emergency room (ER)

evaluation and treatment. She stayed to see the SANE for forensic purposes: to

help make sure the attacker was not "out there doing this to someone else." 6

Verbatim Transcript of Proceedings (VTP) (Nov. 3, 2016) at 622.

The fact that that forensic exam was conducted by a trained, professional,

compassionate member of the medical profession, rather than by a law

enforcement officer, is a significant advance for patient care—an advance that is

particularly important for those rape victims who lack the ability to advocate

strongly for themselves. But we are not presented with a medical care question;

we are presented with a legal question. The legal question that the confrontation

clause[3] compels us to ask is whether the statements elicited by the SANE, to help

prevent the person who raped K.E.H. from "doing this to someone else," are

testimonial—i.e., made primarily to help law enforcement and prosecution—or

nontestimonial —i.e., made primarily for medical treatment.

The majority answers this question by focusing on each separate statement

K.E.H. made and looking at the character of that statement. I respectfully disagree

with this approach. I think that controlling decisions of the United States Supreme

Court compel us to look at the overall purpose of the discussion/interrogation first

---

[3] U.S. CONST. amend. VI.

2

State v. Burke (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

and consider each statement in that context. And in this case, that contextual

analysis shows that K.E.H.'s statements to the SANE were made in anticipation of

prosecuting the rapist; hence, they were testimonial for Sixth Amendment

purposes. I concur, however, because the admission of the testimonial statements

was harmless beyond a reasonable doubt.

I.      K.E.H.'s Statements to SANE Kay Frey during the Forensic Examination
Were Testimonial

     *A. To Determine Whether K.E.H.'s Statements to the SANE Were
Testimonial, We Focus on the Context of the Entire Forensic Exam*

The confrontation clause of the Sixth Amendment guarantees that "[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him." U.S. CONST. amend. VI. "Witnesses" are those who

"'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158

L. Ed. 2d 177 (2004) (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF

THE ENGLISH LANGUAGE (1828)). Thus, out-of-court testimonial statements are

inadmissible at trial against a criminal defendant if the declarant is "'unavailable to

testify,'" unless "'the defendant had had a prior opportunity for cross-

examination.'" *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L.

Ed. 2d 224 (2006) (quoting *Crawford*, 541 U.S. at 53-54). I agree with the

majority on all of these points.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The majority is also correct in holding that we use the primary purpose test to determine whether such out-of-court statements are testimonial. Majority at 2 (citing *Ohio v. Clark*, 576 U.S. 237, 245, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015); *State v. Scanlan*, 193 Wn.2d 753, 766, 445 P.3d 960 (2019), *cert. denied*, 140 S. Ct. 834 (2020)).

But controlling United States Supreme Court precedent makes clear that the primary purpose test focuses on the purpose "of the *interrogation*," *Davis*, 547 U.S. at 822 (emphasis added)—not on a single question and answer within that interrogation. The individual statements made during the course of an interrogation are, of course, relevant to determining the primary purpose of that interrogation. Courts must, however, focus on the overall context. *Clark*, 576 U.S. at 249.

The Supreme Court clearly adopted this approach because of the concerns that led to the adoption of the confrontation clause in the first place. In *Crawford*, for example, the Court traced the history of the development of the confrontation right at English common law and in early America and concluded that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as

4

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

evidence against the accused"; it then directed that "[t]he Sixth Amendment must be interpreted with this focus in mind." *Crawford*, 541 U.S. at 50.

"This focus" is a focus on the overall procedure by which the state obtains statements from its witnesses. With that focus, the Supreme Court has consistently emphasized that trial courts must determine not whether the primary purpose of a specific *statement* in isolation is testimonial but, rather, whether "the primary purpose *of the interrogation* is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822 (emphasis added); *see also Clark*, 576 U.S. at 249 ("[c]ourts must evaluate challenged statements in context" in conducting a primary purpose analysis); *Michigan v. Bryant*, 562 U.S. 344, 370, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (courts "should determine the primary purpose of the interrogation by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs" (internal quotation marks omitted)).

The majority, however, focuses on each individual statement within the interrogation. For example, the majority initially explains that "[t]o determine whether a *statement* is testimonial, we must identify *its primary purpose*," and then concludes that "under these circumstances, the primary purpose of *nearly all of* [*K.E.H.'s*] *statements*" was nontestimonial. Majority at 2 (emphasis added). It

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

continues, "[S]tatements are nontestimonial when *they* have another primary purpose," and "[u]nder these circumstances, most of K.E.H.'s *statements* cannot be characterized as *primarily* testimonial." *Id.* at 15, 27 (emphasis added).

To be sure, the majority also quotes *Davis* for the rule that statements "'are testimonial when the circumstances objectively indicate that . . . the primary purpose *of the interrogation* is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 13 (alteration in original) (emphasis added) (quoting *Davis*, 547 U.S. at 822); *see also id.* at 14. But the majority does not distinguish between this contextual approach and its other, largely statement-by-statement, approach.

These two different approaches, however, are not interchangeable. Conflating them deemphasizes the importance of the structural context in which a conversation takes place. *Davis*, 547 U.S. at 821; *Crawford*, 541 U.S. at 52 (statements are testimonial where they "were made *under circumstances* which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (emphasis added) (internal quotation marks omitted)).

This is not the first time that the Supreme Court has held that a "context" approach sheds more light on the character of a statement than a "statement-by-

6

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

statement" approach does. In *Missouri v. Siebert*, for example—a Fifth

Amendment (rather than a Sixth Amendment) case—the Court examined the

constitutionality of a police interrogation strategy that divided up the interrogation

of a criminal suspect into two parts. 542 U.S. 600, 616, 124 S. Ct. 2601, 159 L. Ed.

2d 643 (2004); U.S. CONST. amend. V. In part one, officers would withhold

*Miranda*[4] warnings and question the suspect up to the point of a confession; in part

two, officers would give the already-confessing suspect *Miranda* warnings and

elicit a repetition of the confession. *Id.* at 616-17. The Court held that such a two-

part interrogation strategy made the belated *Miranda* warnings ineffective. *Id.*

Hence, the Court concluded, the defendant's confession repeated after the belated

warnings must be suppressed. *Id*. at 617. This was a commonsense approach that

appreciated procedural context in determining the character of a declarant's

statements within that context.

The Sixth Amendment confrontation clause also provides a procedural

protection. Thus, it is not surprising that the Supreme Court has also emphasized

the importance of the procedural context to determining the character of a

declarant's statements for Sixth Amendment purposes. In particular, the Supreme

Court requires us to maintain an overall focus on the identity of the interrogator,

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

their links to law enforcement, and whether the conversation was the result of a formal procedure. *Clark*, 576 U.S. at 249 ("Courts must evaluate challenged statements in context, and part of that context is the questioner's identity." (citing *Bryant*, 562 U.S. at 369)).

It is certainly true that a single conversation may contain some statements that are made primarily to help prosecute a suspect and some statements that are made primarily for medical treatment or other reasons. But courts can't determine the testimonial or nontestimonial character of each statement by zooming in on its language. Instead, we view those statements in context—and ask whether in context, the entire conversation has shifted from nontestimonial to testimonial or back again. In *Davis*, for example, the Court reviewed a 911 call that began with the 911 operator asking questions to determine the need for emergency assistance. 547 U.S. at 828. Such questions would not typically produce testimonial answers. But the Court continued, explaining that the answers can "'evolve into testimonial statements'" once the original purpose of meeting the emergency is met. *Id.* (quoting *Hammon v. Indiana*, 829 N.E.2d 444, 457 (2005), *rev'd by Davis*, 547 U.S. 813); *see also State v. Koslowski*, 166 Wn.2d 409, 419, 209 P.3d 479 (2009) (citing *Davis*, 547 U.S. at 828). The focus, however, remained on the purpose of the questions and answers in the context of the full conversation.

8

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

> *B. In Focusing on the Context of the Entire Forensic Exam, We Evaluate Four Main Factors—All Point toward K.E.H.'s Statements Being Testimonial*

To evaluate that context (and whether it changed from testimonial to nontestimonial), we use the primary purpose test set forth by the Supreme Court and adopted by this court. "Under the primary purpose test, courts objectively evaluate the circumstances in which *the encounter occurs*, as well as the parties' statements and actions." *Scanlan*, 193 Wn.2d at 767 (emphasis added) (citing *Bryant*, 562 U.S. at 359). "'[T]he question is whether, *in light of all the circumstances*, viewed objectively, the "*primary purpose*" *of the conversation* was to "creat[e] an out-of-court substitute for trial testimony."'" *Id.* (second alteration in original) (emphasis added) (quoting *Clark*, 576 U.S. at 245 (quoting *Bryant*, 562 U.S. at 358)). Statements are testimonial only when "the *primary purpose of the interrogation* is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 763 (some emphasis omitted) (quoting *Davis*, 547 U.S. at 822).

Here, four main factors make clear that the objective primary purpose of the examination was to establish or prove past events potentially relevant to later criminal prosecution: (1) the objective manifestation of K.E.H.'s intent in undergoing the exam, (2) the objective manifestation of Frey's intent in conducting

9

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

the exam, in light of the history and purpose of SANE nursing and the Washington statutory scheme, (3) the lack of ongoing emergency, evidenced by the bifurcated nature of the exam, and (4) the exam's formality.

### 1. K.E.H.'s Intent

The declarant's purpose in engaging in a conversation is a critically important factor to consider. *Clark*, 576 U.S. at 247-48 (one factor in determining whether 3-year-old child's statements to his teachers were testimonial was the child's ability to form the intent that his statements be used by police or prosecutors or as a substitute for trial testimony); *Davis*, 547 U.S. at 827 (intent of victim in making a 911 call was factor bearing on whether statements on the call were testimonial).

In this case, as the majority explains, K.E.H. was medically cleared by the emergency department around 11 AM on July 3. 6 VTP (Nov. 3, 2016) at 603. By this time, her case had already been reported to Tacoma police and K.E.H. had provided them with a statement. 8 VTP (Nov. 8, 2016) at 836-38, 841. K.E.H. then chose to wait in the hospital for almost five hours to undergo a sexual assault examination. That exam was conducted by SANE Frey at around 4 PM. 6 VTP (Nov. 3, 2016) at 605.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

K.E.H. made clear to Frey that her goal for the exam—the reason she waited hours for it in the hospital—was to prevent her attacker from being "out there doing this to someone else." *Id*. at 622; Pretrial Mot. Ex. 19F. In fact, K.E.H. told Frey that this reason was "basically why she came." 6 VTP (Nov. 3, 2016) at 622.

K.E.H.'s goal was reflected in her actions leading up to the SANE exam. K.E.H. signed a consent form specifying that she was consenting to "a *forensic* evaluation to be performed by a *Forensic* Nurse Examiner to include documentation of the assault, collection of evidence, nursing care and treatment limited to MultiCare Health System's Forensic Nurse Examiner nursing protocols." Pretrial Mot. Ex. 19B (emphasis added); 6 VTP (Nov. 3, 2016) at 606. The form indicated that "[a] forensic evaluation does *not* include general medical care." Pretrial Mot. Ex. 19B (emphasis added); 6 VTP (Nov. 3, 2016) at 557. It explained that "evidence such as swabs, blood, hair, nail samples may be collected" and that "in assault cases that have been reported to law enforcement, the forensic nurse examiner may speak to the investigating officer." 6 VTP (Nov. 3, 2016) at 558; Pretrial Mot. Ex. 19B. It noted that the "detailed medical records (photographs, lab results, written documentation)" would be kept confidential but could be disclosed "as allowed by law." Pretrial Mot. Ex. 19B (emphasis omitted).

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

A discharge form given to K.E.H. after the examination[5] similarly explained that K.E.H. had just undergone a forensic evaluation for "collection of evidence for investigative purposes." 6 VTP (Nov. 3, 2016) at 561; Pretrial Mot. Ex. 19I. It further stated, "If your assault was reported to the police, your evidence will be transferred directly to Tacoma Police Department." 6 VTP (Nov. 3, 2016) at 561; Pretrial Mot. Ex. 19I.

Viewed objectively, K.E.H.'s statement to Frey, coupled with her knowledge of the forensic purpose of the examination as described on the consent and discharge forms, indicates that her primary purpose in engaging in the examination was not to seek medical treatment but to assist in evidence collection that could be used to ensure her attacker did not "do[] this to someone else." 6 VTP (Nov. 3, 2016) at 622; Pretrial Mot. Ex. 19F.

2. *SANE Frey's Intent*

The intent of Frey, viewed objectively, is also an important factor to consider in determining whether K.E.H.'s out-of-court statements are testimonial.

---

[5] Frey testified that she had not been able to retain a copy of the discharge form signed by K.E.H. because K.E.H. "took both copies, originally," and Frey had to fill out another copy for her own records. 6 VTP (Nov. 3, 2016) at 561. Because of this, Frey could not confirm that K.E.H. had signed the discharge form, but Frey testified that she had given the form to K.E.H. and that it was common practice for the patient to sign the discharge form because "there's a place for the patient to sign it." *Id.* at 562.

12

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

"Courts must evaluate challenged statements in context, and part of that context is the questioner's identity." *Clark*, 576 U.S. at 249 (citing *Bryant*, 562 U.S. at 369). Statements made to a questioner who "is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id*. However, the Court has expressly declined to adopt a categorical rule excluding statements to nonpolice questioners as beyond the reach of the confrontation clause. *Id.* at 246.

Here, Frey's identity as a SANE colors the entire interaction and each statement within it. An overview of the development of SANE nursing shows that the primary purpose of a SANE's interrogation in general is "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

The SANE specialization falls within the field of forensic nursing. *What is Forensic Nursing?*, INT'L ASS'N OF FORENSIC NURSES, https://www.forensicnurses.org/page/WhatisFN [https://perma.cc/D4H5-B3LV]. Thus, SANEs may also be referred to as forensic nurses or forensic nurse examiners.[6] SANE programs were developed in response to "the inadequacy of the

---

[6] Frey testified that her job title was "forensic nurse examiner." 6 VTP (Nov. 3, 2016) at 554. Tacoma General Hospital also refers to its "Forensic Nurse Examiner

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

medical evidentiary examination." Linda A. Hutson, *Development of Sexual Assault Nurse Examiner Programs*, 37 NURSING CLINICS OF N. AM. 79, 84 (2002) (hereinafter *Development of SANE Programs*). The first such programs were developed in the 1970s, when "[m]any hospitals did not have a rape protocol" and "[s]ome hospital personnel were afraid of the forensic component of evidence collection." Linda E. Ledray & Sherry Arndt, *Examining the Sexual Assault Victim: A New Model for Nursing Care*, 32 J. PSYCHOSOCIAL NURSING & MENTAL HEALTH SERVS. 7, 8 (1994) (hereinafter *Examining the Sexual Assault Victim*).

SANE programs thus were developed to address two main problems: that untrained hospital staff retraumatized sexual assault victims when conducting physical examinations, and that lack of training in the collection and preservation of *evidence* specifically posed a problem for future prosecutions. *Development of SANE Programs* at 84; *see also Examining the Sexual Assault Victim* at 8. Further, "when evidence was collected by hospital staff, [that staff was] often unavailable to law enforcement for the continuation of the investigation and prosecution of a sexual assault case." *Development of SANE Programs* at 79; *see also Examining the Sexual Assault Victim* at 7.

---

service." *See* Sexual Assault Services, MULTICARE, https://www.multicare.org/sexual-assault-services/ [https://perma.cc/TNJ6-983M].

14

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

By contrast, SANEs are trained in "forensic evidence collection, sexual assault trauma response, forensic techniques using special equipment, expert-witness testimony, assessment and documentation of injuries, identifying patterned injury, and maintenance chain of evidence." Debra Patterson, Rebecca Campbell & Stephanie M. Townsend, *Sexual Assault Nurse Examiner (SANE) Program Goals and Patient Care Practices*, 38 J. NURSING SCHOLARSHIP 180, 181 (2006). While providing compassionate medical care to sexual assault survivors has always been an integral component of SANE nursing, "[t]he primary goal of the SANE is to provide objective forensic evaluation of the survivors of sexual assault." *Development of SANE Programs* at 84.

SANE programs and nurses, then, frequently work closely with police and prosecutors, even where they do not work directly for the police. *Examining the Sexual Assault Victim* at 8. Here, Frey testified that she was employed by MultiCare, the health care entity that operates Tacoma General Hospital. 6 VTP (Nov. 3, 2016) at 548. Frey was not a law enforcement "official." *State v. Burke*, 6 Wn. App. 2d 950, 969 n.4, 431 P.3d 1109 (2018). But the Supreme Court has made clear that people conducting interrogations on behalf of the police may be considered law enforcement agents for purposes of the confrontation clause

15

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

analysis.[7] Indeed, some courts have recognized the close ties between SANEs and

law enforcement and have held that the primary purpose of SANE sexual assault

interviews is testimonial as a matter of law.[8]

In addition, in this case, the cost of the SANE exam was covered by the

State pursuant to state statute. That statute, RCW 7.68.170, provides:

> No costs incurred by a hospital or other emergency medical facility for the examination of the victim of a sexual assault, when such examination is performed *for the purposes of gathering evidence for possible prosecution*, shall be billed or charged directly or indirectly to the victim of such assault. Such costs shall be paid by the state pursuant to this chapter.

(Emphasis added.) The administrative code further explains that

---

[7] *See Davis*, 547 U.S. at 823 n.2 (911 operators may be police agents when they conduct interrogations of callers).

[8] *Hartsfield v. Commonwealth*, 277 S.W.3d 239, 244 (Ky. 2009) ("We believe their function of evidence gathering, combined with their close relationships with law enforcement, renders SANE nurses' interviews the functional equivalent of police questioning."); *see also Medina v. State*, 122 Nev. 346, 354-55, 143 P.3d 471 (2006) (defining a SANE as a "police operative" because she "gathers evidence for the prosecution for possible use in later prosecutions," thus leading "an objective witness to reasonably believe that the statements would be available for use at a later trial"). Courts that have declined to adopt a per se rule regarding the primary purpose of SANE examinations have still found that a SANE acted as a law enforcement agent when acting in her evidence-collecting role. *See, e.g.*, *State v. Bennington*, 293 Kan. 503, 523, 264 P.3d 440 (2011) (SANE asked victim questions from state-provided questionnaire as part of completion of sexual assault evidence collection kit); *State v. Miller*, 293 Kan. 535, 578, 264 P.3d 461 (2011) (same); *People v. Vargas*, 178 Cal. App. 4th 647, 662, 100 Cal. Rptr. 3d 578 (2009) (SANE who examined victim hours after assault did so "for the primary purpose of documenting the nature of the sexual assault and gathering evidence for transmittal to the police and for possible later use in court").

16

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

> [w]hen a sexual assault examination is performed for the purpose of gathering evidence for possible prosecution, the costs of the examination *must* be billed to the crime victims compensation program. We are the primary payer of this benefit. The client is not required to file an application with us to receive this benefit and may not be billed for these costs. If the examination includes treatment costs or the client will require follow-up treatment, an application for benefits must be filed with us for these services to be considered for payment.

WAC 296-30-170 (emphasis added). Under Washington state law, the conclusion seems inescapable that a SANE exam that is eligible for reimbursement by the State is a SANE exam "performed *for the purposes of gathering evidence for possible prosecution.*"

Consistent with the general statutory purpose of such SANE exams, the consent form K.E.H. signed before the exam noted that "[a] forensic exam is available to me at public expense, if eligible, according to RCW 7.68.170." Pretrial Mot. Ex. 19B. Frey confirmed that the exam was funded by the State. 6 VTP (Nov. 3, 2016) at 558. The hospital's act of obtaining that funding from the State indicates that a representation was made that the "examination [was] performed for the purposes of gathering evidence for possible prosecution." RCW 7.68.170.

Thus, while a SANE's specialization may not "transform a class of medical professionals into agents of the police," majority at 19, the field of SANE nursing

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

has unique links to law enforcement, prosecution, and evidence collection that distinguish it from other areas of medicine.

Indeed, the forensic purpose of SANEs distinguishes this case from *Scanlan*, our recent confrontation clause case cited by the majority. 193 Wn.2d 753. In that case, an elder abuse victim made statements to various medical providers identifying the perpetrator and describing the cause of his injuries. *Id.* at 768. After his ER visit, that victim signed release forms authorizing police and prosecutors to obtain his medical records "in furtherance of the investigation and any resulting prosecution." *Id.* at 770, 775 (internal quotation marks omitted). We recognized that obtaining medical treatment was a nontestimonial primary purpose, acknowledging that "[a]s a threshold matter, [the victim's] statements are 'significantly less likely to be testimonial than statements given to law enforcement officers' because medical personnel are 'not principally charged with uncovering and prosecuting criminal behavior.'" *Scanlan*, 193 Wn.2d at 767 (quoting *Clark*, 576 U.S. at 249). And that was true of the medical providers in *Scanlan*, including ER personnel, the victim's primary care physician, and wound treatment specialists, *id.* at 757; none of these fields of medical practice were developed with a dual forensic and medical purpose, so the victim would have seen these same

18

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

professionals for emergency or follow-up care, regardless of whether he had signed release forms or sought to press charges.

Frey, in contrast, did not provide general medical care—only medical care "specific to . . . sexual assault." 6 VTP (Nov. 3, 2016) at 565. In fact, she explained that only the emergency department provided general medical care—"things like . . . a full evaluation by the emergency room physician and any testing that might be needed, that's medical care done by the emergency department"—and that "[o]nce [the victim is] cleared from that, then the forensic piece starts. So even though medications are given by me at the end, based on protocols and such . . . *the overall medical responsibility is the emergency room provider.*" *Id.* at 564 (emphasis added). K.E.H. was directed to follow up not with Frey but with Planned Parenthood and to return to the ER if bleeding continued. *Id.* at 644; Pretrial Mot. Ex. 19I.

To be sure, Frey's exam had both medical and forensic purposes. 6 VTP (Nov. 3, 2016) at 545. But consistent with her profession, she described an overwhelmingly forensic purpose. Indeed, much of Frey's testimony described the forensic components of the exam, including photographing injuries and "doing any DNA [deoxyribonucleic acid] retrieval that could be done." *Id.* She described at length the subsequent procedures she followed to package and preserve evidence,

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

including maintaining a chain of custody. *Id.* at 545, 550, 551, 559-60, 645-46.

And notably, she described "taking a [patient] history" as part of "the forensic

piece." *Id.* at 545. She testified that the patient history helps the nurse know where

to look for evidence. *Id.* at 567.

The majority highlights the fact that Frey's examination uncovered an

internal injury that had not previously been discovered by ER personnel. Majority

at 25-26; 6 VTP (Nov. 3, 2016) at 547. But it is not disputed that Frey's duties

included medical treatment as well as forensic evidence collection, and Frey's

discovery of this additional injury does not negate the fact that under these

circumstances, the primary purpose of this examination by a *forensic nurse* was to

collect evidence. The physical evidence collected was indisputably collected and

preserved for forensic purposes. 6 VTP (Nov. 3, 2016) at 559. The verbal

statements elicited from K.E.H. in order to facilitate the collection of that physical

evidence were equally testimonial—made with the primary purpose of "creating

evidence for [the defendant's] prosecution." *Clark*, 576 U.S. at 246 (explaining, by

contrast, that a conversation between a 3-year-old and his teachers who were

concerned about the possibility of child abuse at home did not have the primary

purpose of "creating evidence for . . . prosecution"). Thus, as a SANE charged with

collecting and preserving evidence in a form that could be used at a criminal trial,

20

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

Frey's role was much closer to "uncovering and prosecuting criminal behavior," *id.* at 249, than were the roles of the medical personnel in *Scanlan*.

### 3. *No Ongoing Emergency*

The fact that there was no ongoing emergency at the time K.E.H. presented to Frey is also a highly relevant factor "'that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.'" *Id.* at 245 (quoting *Bryant*, 562 U.S. at 366). For example, in *Clark*, the Court found it important that the teachers who questioned the child regarding his bruises acted in response to an ongoing emergency, namely whether it was safe to release the child into the custody of a potentially abusive caregiver. *Id.* at 247. And in *Scanlan*, our court emphasized that the statements to the medical personnel who treated the victim needed to be analyzed in light of the fact that the providers were concerned with a similar ongoing emergency—whether the victim would be safe upon returning home, since his abuser was his live-in partner. 193 Wn.2d at 768-69.

Here, there was no such ongoing emergency. K.E.H.'s attacker was a stranger, and thus, there was no similar concern that K.E.H. would be released back into the control of an abusive partner or family member. K.E.H. had been medically cleared by the emergency room and chose to wait for five hours to speak with and be examined by the SANE. The bifurcated nature of the exam into an

21

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

emergency medical treatment component and a forensic examination component

further supports that the primary purpose of the interaction with the SANE was

testimonial. *See, e.g.*, *State v. Bennington*, 293 Kan. 503, 518, 264 P.3d 440 (2011)

(statements made to SANE testimonial where victim was first questioned about

assault in presence of police officer and underwent examination afterward); *State*

*v. Cannon*, 254 S.W.3d 287, 305 (Tenn. 2008) (statements made to sexual assault

nurse were testimonial when emergency room medical professionals had examined

and treated the victim before she spoke to the nurse); *State v. Hooper*, 145 Idaho

139, 145-46, 176 P.3d 911 (2007) (statements made to forensic nurse at sexual

trauma center were testimonial when medical examination by physician had first

been conducted); *United States v. Gardinier*, 65 M.J. 60, 65-66 (2007) (statements

made to SANE were testimonial when made during a forensic medical examination

performed several days after the victim had been treated by other medical

professionals); *United States v. Bordeaux*, 400 F.3d 548, 556 (8th Cir. 2005)

(statements made to "forensic interviewer" were testimonial where a physician

separately provided victim with comprehensive medical care).

    4. *Formality of Examination*

    Finally, *Crawford* and its progeny make very clear that procedural formality

is an important factor in determining whether an interrogation has produced

22

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

testimonial statements. *Crawford*, 541 U.S. at 51; *Davis*, 547 U.S. at 827 (level of formality of the conversation was important factor in determining that 911 call was not testimonial); *Bryant*, 562 U.S. at 377 ("This situation is more similar, though not identical, to the informal, harried 911 call in *Davis* than to the structured, station-house interview in *Crawford*."); *Clark*, 576 U.S. at 247 ("This was nothing like the formalized station-house questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon*[9].").

Frey emphasized that her examination was conducted according to a formal forensic procedure, that is, MultiCare's SANE protocol. 6 VTP (Nov. 3, 2016) at 545, 547, 550, 557, 564, 565, 645-46. In accordance with this protocol, Frey first had K.E.H. sign the consent form and then proceeded to obtain a patient history. *Id.* at 597. Frey asked an open-ended question to begin the patient history documentation: "Can you tell me what happened in Wright[ ] Park?" *Id.* at 549, 611. This all followed that formal protocol. *Id.* at 545. Frey then completed standard forms requiring her to ask a series of "more targeted questions" to K.E.H. regarding the assault. 6 VTP (Nov. 3, 2016) at 613-17; Pretrial Mot. Exs. 19C, 19D. Frey next performed a head-to-toe physical exam, followed by a genital

---

[9] *Hammon v. Indiana*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), was decided along with *Davis*.

23

exam. 6 VTP (Nov. 3, 2016) at 626, 631. She took swabs and collected evidence according to protocol, eventually placing the completed rape kit into a refrigerator to be picked up by police. *Id.* at 648-49. This structured, step-by-step procedure much more closely resembles "formalized station-house questioning" by police than it does an informal conversation between a preschool student and his teachers or a frenzied 911 call made while the caller was still in immediate danger. *Clark*, 576 U.S. at 247; *compare id. and Davis*, 547 U.S. at 827, *with Crawford*, 541 U.S. at 51; *see also* Dylan O. Keenan, *Confronting* Crawford v. Washington *in the Lower Courts*, 122 YALE L.J. 782, 831 (2012) ("SANE nurses are trained to collect evidence and assess sexual assault. Their structured questioning has much more in common with the ex parte examinations that concerned the Framers than does the conduct of a police officer who arrives along with the ambulance. Lower courts, by excluding testimony from SANE nurses . . . are hewing closely to *Crawford*'s contours.").

In sum, the overall character of the SANE exam, following the ER exam, was forensic: to develop evidence for potential use at trial. That character of the exam remained the same from beginning to end. The compassion and skill with which Frey treated the patient did not change that purpose. In fact, those qualities made it easier for Frey to achieve that forensic purpose.

24

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

II.     Admission of the Statements Was Harmless beyond a Reasonable Doubt

As a result, Frey elicited and then testified about numerous statements

K.E.H. made during the exam. Frey read the jury a statement K.E.H. made to her

that Frey had recorded on a form labeled "Forensic Evaluation: Patient Narrative":

> "I was sitting there rolling myself a cigarette. I know he covered my mouth because I would have been screaming for help. I was taken to the ground. I don't know if he tried choking me or not. The next thing I knew, I was taken to the ground, my pants were off and stuff, and he was inside me. It was over and done with. I think he told me to keep my mouth shut. That's all I remember. Then I came here. I walked over to the hospital."

6 VTP (Nov. 3, 2016) at 612; Pretrial Mot. Ex. 19E. Frey also read K.E.H.'s

description of her assailant into the record: "'He was tall, a light black, no hair or

short hair. He had a white t-shirt and jeans. No jacket.'" 6 VTP (Nov. 3, 2016) at

614. Frey also testified as to K.E.H.'s answers to standardized questions included

on the "Forensic Evaluation: Patient History A" and "B" forms. *Id*. at 614-17;

Pretrial Mot. Exs. 19C, 19D. These questions included whether the attacker had

used weapons or threats, whether there was any "grabbing, grasping, or holding"

during the incident, whether penetration occurred, whether contraception was used,

K.E.H.'s position during the assault, and K.E.H.'s pain level and areas of pain. 6

VTP (Nov. 3, 2016) at 614-21.

25

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

Although these statements may have been relevant to medical treatment, the primary purpose of the questions Frey posed in the context of this sexual assault examination was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. The objective manifestations of forensic intent evidenced by both parties, the specific history and purpose of SANE nursing, the lack of ongoing emergency, and the high level of formality of the exam make this clear. Thus, admission of all of these out-of-court statements—not just the statement of identity cited by the majority—violated the confrontation clause.

A violation of the Sixth Amendment is constitutional error. A constitutional error is harmless only if the State proves "beyond a reasonable doubt [that] any reasonable jury would reach the same result absent the error, and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt."[10]

Ronald Burke was charged with rape in the second degree, which required the jury to find beyond a reasonable doubt that he had engaged in sexual intercourse by forcible compulsion with K.E.H. Clerk's Papers at 85. Here, even

---

[10] *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996) (citation omitted) (citing *State v. Aumick*, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995); *State v. Whelchel*, 115 Wn.2d 708, 728, 801 P.2d 948 (1990)); *see Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

State v. Burke (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

without K.E.H.'s statements, the jury was presented with overwhelming evidence that sexual intercourse had occurred. Evidence of semen was found in K.E.H.'s underwear. 7 VTP (Nov. 7, 2016) at 723. K.E.H.'s genital exam also revealed evidence consistent with sexual intercourse. 6 VTP (Nov. 3, 2016) at 641, 643.

I agree with the majority that the jury also heard overwhelming evidence that Burke was the source of the semen. Evidence was introduced that Burke lived near Wright Park in 2009 and had been to the park. 8 VTP (Nov. 8, 2016) at 807-08. Prior to describing the assailant to Frey, K.E.H. had described his appearance to an investigating officer after she arrived at the hospital on the night of July 3, 2009. *Id.* at 843. Later, a DNA sample obtained from K.E.H.'s underwear during the forensic exam was matched to Burke's DNA, and the jury heard detailed testimony from a DNA analyst explaining the very low likelihood that the DNA belonged to anyone other than Burke. 7 VTP (Nov. 7, 2016) at 745; *see* majority at 30-31. Thus, the admission of the testimonial statements was harmless as to Burke's identity and the fact of intercourse.

The State also presented overwhelming evidence of forcible compulsion even without K.E.H.'s testimonial statements. K.E.H. showed up at the hospital late at night, "very upset" and crying, with "leaves and grass in her hair." 8 VTP (Nov. 8, 2016) at 855. She reported to an ER nurse and a social worker that she

27

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

had been raped in Wright Park, and the admissibility of these statements has not been challenged. 7 VTP (Nov. 7, 2016) at 689; 8 VTP (Nov. 8, 2016) at 856. K.E.H. described her assailant and the place in the park where the attack had occurred to the officer who was dispatched to the hospital, and those statements were also admitted without objection. 8 VTP (Nov. 8, 2016) at 841. The defendant did not testify; K.E.H.'s testimony on these points was undisputed.

In the unchallenged portion of her testimony, Frey also described her observations of K.E.H., including injuries she documented during the forensic examination. K.E.H. had suffered a cervical laceration which was still "actively bleeding." 6 VTP (Nov. 3, 2016) at 643. Frey testified that having done hundreds of pelvic exams over the course of her career, this type of cervical injury was very unusual. *Id.* In fact, she testified that she had never seen this type of cervical injury occurring even with forcible consensual sex. *Id.* at 659. Thus, Frey testified that the cervical laceration was consistent with forcible, nonconsensual intercourse. *Id.* at 643 ("I would say 'no' to this being a consensual thing. It's hard to do this to a tough muscle."). This was so even considering K.E.H.'s postmenopausal status and

28

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

the possibility that she could have been suffering from the beginning stages of the cervical cancer that was a probable cause of her 2011 death. *Id.* at 657, 660-63.[11]

Based on the properly admitted evidence, the State proved beyond a reasonable doubt that admission of the testimonial statements was harmless.

III.    Conclusion

SANEs provide an extremely valuable service to survivors of sexual assault. But that does not mean that out-of-court statements SANEs elicit from patients are exempt from confrontation clause analysis. Instead, the federal constitution requires courts to analyze the out-of-court statements SANEs elicit from survivors or witnesses the same way that courts analyze out-of-court statements that other forensic professionals elicit from other complainants or witnesses. Courts must place primary emphasis on context. The context includes the development of the SANE medical/forensic field in the first place, the professional forensic training SANEs receive, the forensic functions that they perform, and the State's statutory

---

[11] Frey testified that the cervical injury was unlikely to have been caused by any postmenopausal changes in lubrication, stating that the cervix continues to be "pretty active in terms of lubrication" even in postmenopausal women like K.E.H. 6 VTP (Nov. 3, 2016) at 657. Thus, even with lubrication issues, "you would see vaginal injuries more commonly than anything on the cervix." *Id.* at 658. Although Frey testified that cervical cancer "could" make the cervix more vulnerable to injury, she also stated that at the time of the exam, K.E.H. did not have end-stage cervical cancer based on the appearance of her cervix. *Id.* at 660, 662.

29

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Burke* (*Ronald Delester*), No. 96783-1
(Gordon McCloud, J., concurring)

financial support for those forensic functions in evaluating individual statements.

The majority fails to adequately consider that the primary purpose of this forensic

examination, under the totality of the circumstances, was "to establish or prove

past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at

822.

I therefore respectfully concur.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Mann, J.P.T.