IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 83408-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ALEX MIYARES, | ) | |
| | ) | |
| Appellant | ) | |
| | ) | |

ANDRUS, C.J. — Alex Miyares appeals his convictions for first degree child molestation, arguing the trial court erred in admitting hearsay statements made by the child victim, that he received ineffective assistance of counsel, and that he was denied the right to present a defense. We disagree and affirm his conviction.

## FACTS

In 2018, seven-year-old B.B. lived with her adoptive mother and biological aunt, Kaylyn Tolliver,[1] Tolliver's partner, Taki Alazadi, their infant son, and two other adults, Tolliver's childhood friend, Ashlee Hoyt, and her boyfriend, Miyares. After Hoyt moved out of the home, Miyares continued to live in a bedroom on the lower level of Tolliver's home.

---

[1] B.B.'s biological mother, Tolliver's sister, struggled with drug addiction and B.B.'s biological father passed away years before.

Citations and pin cites are based on the Westlaw online version of the cited material.

B.B., who had a very close relationship with Hoyt, had developed a good relationship with Miyares. Miyares watched B.B. while Tolliver and Alazadi were working and helped out by picking her up from school. Miyares took B.B. on outings to play golf or to visit his mother. And B.B. often watched movies with Miyares in his bedroom, sitting with him on his bed with the door closed.

On the evening of December 22, 2018, B.B. and Miyares were sitting on his bed watching television. When Tolliver went to Miyares' room to tell B.B. it was time for bed, she saw Miyares and B.B. both sit up "very quickly off the bed like they were surprised." Initially, Tolliver thought they reacted this way because Miyares was smoking hookah and B.B. was not allowed to be around him when he smoked. After a brief conversation, Tolliver and B.B. went upstairs and went to bed.

The next morning, feeling uneasy, Tolliver asked B.B. why she and Miyares were startled and jumped up so fast when she walked into the room. B.B. began to cry and told Tolliver "Alex touches me." When Tolliver asked what that meant, B.B. explained "like my private parts." Tolliver confirmed that B.B. understood the seriousness of her accusation. Tolliver testified that B.B. was very upset, crying, and unwilling to disclose any details.

Tolliver shared these allegations with Alazadi, who asked B.B. to explain to him what had happened. According to Alazadi, B.B. told him that Miyares had touched her inappropriately. Like Tolliver, Alazadi confronted B.B. about the severity of her allegations and asked her repeatedly if she was sure. She

responded that she was. She also told Alazadi that Miyares told her not to tell anyone.

After reporting the incident to the police, and at the police suggestion, Tolliver took B.B. to a hospital where Dr. Randal Bensen examined her. During this examination, B.B. told Dr. Bensen that the most recent episode of inappropriate touching had occurred the prior week. The examination revealed no evidence of any physical trauma to B.B. Child Forensic Interviewer Danielle Singson also interviewed B.B. In that interview, B.B. again disclosed that Miyares had touched her inappropriately.

The State charged Miyares with three counts of child molestation in the first degree. Prior to trial, the State sought to admit out-of-court statements B.B. made to Tolliver, Alazadi, and Singson under RCW 9A.44.120. Following an evidentiary hearing, the trial court concluded that the criteria set forth in *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984) weighed in favor of admissibility and admitted these statements.

Miyares' first trial in October 2020 ended in deadlock. The State retried Miyares in September 2021. The trial court adopted the court's prior ruling regarding the child hearsay and admitted the same testimony.

Miyares testified at the first, but not the second, trial and denied ever touching B.B. The State read this testimony to the jury at the second trial. The jury convicted Miyares of two counts of first-degree child molestation and acquitted him of the third charge. He was sentenced to 75 months to life.

Miyares appeals.

ANALYSIS

1. Child Hearsay

Miyares argues the trial court erred in admitting statements that B.B. made to Tolliver, Alazadi, and Singson under RCW 9A.44.120 because those statements lacked sufficient indicia of reliability. We disagree.

RCW 9A.44.120 allows a trial court to admit child hearsay if it is made by a child under the age of ten and describes any act of sexual contact performed or attempted with or on the child by another, if the trial court concludes, after a hearing, "that the time, content, and circumstances of the statement provide sufficient indicia of reliability," and the child testifies at the proceedings.

In determining the reliability of child hearsay statements, the trial court considers the following nine *Ryan* factors:

> (1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statement; (4) the spontaneity of the statements; (5) the timing of the declaration and the relationship between the declarant and the witness; (6) whether the statement contained express assertions of past fact; (7) whether the declarant's lack of knowledge could be established through cross-examination; (8) the remoteness of the possibility of the declarant's recollection being faulty; and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*State v. Kennealy*, 151 Wn. App. 861, 880, 214 P.3d 200 (2009) (footnote omitted) (citing *Ryan*, 103 Wn.2d at 175-76). No single factor is dispositive, but a statement is not considered reliable unless the factors are "substantially met." *Id.* at 881.

We review a trial court's decision to admit child hearsay for abuse of discretion. *State v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005). We review the trial court's findings of fact for substantial evidence. *State v. A.X.K.*, 12

Wn. App. 2d 287, 298, 457 P.3d 1222 (2020). Miyares challenges the court's findings for the first, second, fourth, fifth, and ninth factors.

Motive to Lie

Miyares contends the trial court erred in finding that B.B. had no apparent motive to lie about the molestation. We disagree. The evidence presented to the court supports the trial court's finding. Tolliver and Alazadi both testified that B.B. and Miyares were close, often spent time together, and had a good relationship. B.B. never expressed any anger or resentment toward Miyares. This evidence supports the trial court's finding that "[n]o evidence tends to indicate there is any apparent motive for [B.B.] to lie."

Miyares nonetheless asserts that B.B. had three potential motives to lie. First, he contends that B.B. had a motive to accuse Miyares of misconduct in order to evade responsibility for violating Tolliver's rule prohibiting her presence while the adults were smoking. While the adults in the house occasionally smoked hookah, Tolliver prohibited B.B. from being present while hookah was out. Despite this rule, on the night Tolliver found B.B. in Miyares' room, Miyares had his hookah pipe out while B.B. was present.

Second, Miyares contends that B.B. had a motive to lie so she could copy her friend, Caytlyn, who had told B.B. she had experienced similar but unrelated sexual misconduct.

The problem with these arguments is that neither party presented any evidence during the child hearsay hearing that Miyares was smoking in B.B.'s presence or that B.B. was violating a rule by being in his room while Miyares

smoked, or that Caytlyn had told B.B. about being sexually molested. The court could not have considered this evidence in conducting its *Ryan* analysis because the evidence was not before it.

Third, Miyares argues that B.B. had a motive to lie simply to attract attention from adults. The evidence does support a conclusion that B.B. had what Tolliver described as a "chaotic" upbringing, due to a mother addicted to drugs and B.B. being removed her from her mother's custody on two occasions. But there is nothing in the record to suggest that these life experiences led B.B. to act out to get attention.[2] The trial court correctly found that "[n]o motive was developed or brought to light in either direct or cross examination."

Because the evidence supports the trial court's finding that B.B. had no apparent motive to lie, the court did not abuse its discretion in concluding the first *Ryan* factor weighed in favor of admitting B.B.'s out-of-court statements.

B.B.'s General Character

Next, Miyares argues nothing in the record establishes B.B.'s reputation for telling the truth and that the record establishes that B.B. was raised in a "chaotic" environment that "would necessarily inhibit a child's ability to distinguish between fact and fiction." The record does not support this argument.

The trial court found that "[B.B.'s] general character favors admissibility of statements. No evidence suggests any reputation for not telling the truth." Substantial evidence in the record supports this finding. B.B. testified that she

---

[2] Miyares contends we should consider evidence that came out at trial in evaluating the trial court's *Ryan* findings. But we find no indication that Miyares asked the trial court to reconsider the child hearsay ruling after the first, and before the second trial, based on evidence that came out at the first trial. Nor do we find any indication he did so at any point during the second trial.

understood the difference between a truth and a lie, described each for the court, and explained that it is very bad not to tell the truth. Tolliver testified that B.B. was "a very outgoing child," "helpful" and "very mature for her age," who understood the difference between a truth and a lie. Alazadi, who had known B.B. since she was three years old, testified that B.B. was not known to lie and that, to his knowledge, she had not lied to him or to anyone else.

Miyares does not explain how the trauma B.B. experienced in her childhood impacted her ability to tell the truth or led her to develop a reputation for being dishonest. There is certainly no evidence to suggest either was the case. The trial court did not abuse its discretion in finding that this factor weighed in favor of reliability.

Spontaneity of the Statements

Miyares next argues that B.B.'s disclosure was not spontaneous because she first made the accusation in response to Tolliver's questions. But for purposes of this factor, statements made by a child victim of sexual assault are considered spontaneous if they are not the result of leading or suggestive questions. *State v. Lopez*, 95 Wn. App. 842, 853, 980 P.2d 224 (1999) (quoting *In re Dependency of S.S.*, 61 Wn. App. 488, 497, 814 P.2d 204 (1991)).

The trial court found that B.B.'s disclosures were the product of "open-ended questions that did not infer any inappropriate conduct had occurred." It also found that none of the questions posed to B.B. "carried any information as if to suggest answers" to her.

There is substantial evidence to support these findings. B.B. first disclosed that Miyares had touched her after Tolliver questioned B.B. about her behavior the night before. Tolliver testified that she did not ask B.B. anything specific, but asked only "What was—why did you act that way when I walked into the room?" When B.B. disclosed that "Alex touches me," Tolliver then asked "what does that mean?" Similarly, Alazadi testified that B.B. made the same disclosure to him after he asked her what had happened. Singson testified that she used open-ended questions to interview B.B. in order to avoid influencing B.B.'s disclosure. None of these witnesses posed leading or suggestive questions to B.B. The trial court did not err in finding that B.B.'s statements were spontaneous.

Relationship Between B.B. and the Witnesses

Miyares next argues that B.B. did not make her disclosures to a neutral party, a fact weighing against admission. The trial court, however, found that Tolliver, Alazadi, and Singson would testify that they heard the same statements describing allegations of sexual contact. While Tolliver and Alazadi are arguably not neutral parties, they were not the only people to whom B.B. made disclosures. B.B. gave a detailed disclosure to Singson, a child forensic interviewer with whom she had no prior relationship, that was the same as her disclosure to Tolliver and Alazadi. The record does not suggest that B.B.'s relationship with Tolliver or Alazadi impacted the reliability of her out-of-court statements under these circumstances.

Circumstances of Disclosure

Finally, Miyares contends that the circumstances of the disclosures suggest that B.B. may have misrepresented Miyares' involvement because there was evidence indicating that B.B. was exposed to other sexual matters, which may have influenced her disclosure.

The trial court found that there was no evidence in the record to suggest B.B. misrepresented Miyares' identity, had a motive to get him into trouble, or wanted to divert attention from herself. It also found that while B.B. had a chaotic upbringing before the age of 6, "there is nothing to explain why a 9 year old would understand sexual matters. There is no evidence to indicate she was exposed to any sexual matters." These findings are also supported by the evidence at the child hearsay hearing.

At trial, Alazadi testified that B.B. had unrestricted access to the internet and Miyares testified that he sometimes caught her watching "explicit content, as in, like, hip-hop music videos." Tolliver testified that B.B.'s friend, Caytlyn, had confided in B.B. that she had also been the victim of an inappropriate touching. But none of this evidence was before the court at the time it ruled on the admissibility of the child hearsay and Miyares never asked the court to reconsider its ruling based on this new evidence.

The State presented sufficient evidence to meet the *Ryan* factors to establish the reliability of the child hearsay statements. The trial court did not abuse its discretion in admitting this evidence at trial.[3]

---

[3] Miyares also argues that, even if the statements were admissible child hearsay, they were nonetheless inadmissible under ER 403 because the repeated recitation of B.B.'s allegations

2. Ineffective Assistance of Counsel

Next, Miyares contends that he received ineffective assistance of counsel due to his counsel's failure to object to Dr. Bensen's repetition of B.B.'s out-of-court statements. We reject this argument.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant's right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on this claim, Miyares must establish that counsel's performance was deficient and resulted in prejudice. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We strongly presume that counsel's representation was effective. *Grier*, 171 Wn.2d at 33. To rebut this presumption, "the defendant bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.'" *Id.* at 42

---

amounted to impermissible vouching. Miyares, however, did not preserve this evidentiary objection and we will not address it. It is the general rule that appellate courts will not consider issues raised for the first time on appeal. RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). Miyares did not raise the issue at the child hearsay hearing and he made only two vouching objections during trial. Both of the objections were made in response to witness testimony that they had asked B.B. if she was sure of what had happened and being honest about it. These objections are unrelated to the argument Miyares now advances on appeal. At no point during trial did Miyares argue that admitting testimony about B.B.'s disclosures from several different witnesses amounted to impermissible vouching or that it was needlessly cumulative. Thus, Miyares did not preserve this argument under ER 403. *See State v. Powell*, 166 Wn.2d 73, 83, 206 P.3d 321 (2009) (failure to object to testimony at trial under ER 403 constitutes failure to preserve evidentiary issue for appeal).

(emphasis omitted) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Where the appellant claims ineffective assistance based on his trial counsel's failure to object, he must show that such an objection, if made, would have been successful in order to establish deficient performance. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 394 (1998). The decision regarding whether and when to object to trial testimony is a "classic example[ ] of trial tactics." *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019).

Miyares contends that his counsel was deficient in failing to object to Dr. Bensen's testimony relaying B.B.'s disclosure because the statements contained inadmissible hearsay. We reject this argument because the challenged testimony was admissible under ER 803(a)(4) and it is unlikely the trial court would have sustained the objection.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Hearsay is inadmissible unless an exception or exclusion applies. ER 802. ER 803(a)(4) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

"[T]he test for statements made for medical diagnosis or treatments considers the subjective purposes of both the declarant and the medical professional." *State v. Burke*, 196 Wn.2d 712, 740, 478 P.3d 1096, cert. denied, 142 S. Ct. 182, 211 L. Ed. 2d 74 (2021). A statement is reasonably pertinent to

diagnosis or treatment when "(1) the declarant's motive in making the statement is to promote treatment, and (2) the medical professional reasonably relied on the statement for purposes of treatment." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007). Statements of fault are generally inadmissible, but depend on the context in which the statements are made. *Id*. Statements attributing fault to a member of the victim's household, however, may be pertinent to treatment if relevant to prevent recurrence of injury. *State v. Ackerman*, 90 Wn. App. 477, 482, 953 P.2d 816 (1998); *see also State v. Ashcraft*, 71 Wn. App. 444, 456, 859 P.2d 60 (1993) ("[I]n abuse cases, it is important for the child to identify the abuser in seeking treatment because the child may have possible psychological injuries and also may be in further danger, due to the continued presence of the abuser in the child's home.").

Dr. Bensen testified that, prior to examining B.B. in the emergency department, he had a conversation with her about what had occurred. He explained that this history "directs me into what areas I'm going to specifically concentrate on" during the examination. Dr. Bensen testified that, during this pre-examination conversation he learned that B.B. had told Tolliver "that a male roommate had been touching her in her private area," the most recent episode of which was the week prior to examination. He also testified that these statements assisted him in diagnosing and treating B.B.

Dr. Bensen confirmed that B.B. was not complaining of any pain or injury to her genital areas. He testified that B.B.'s vital signs were normal and he observed no trauma to the genital area. He also testified that he collected no evidence during

his examination of B.B. because his exam was intended to "make sure there is nothing emergent that needs to be addressed." Only after completing his medical examination did he refer B.B. to a sexual assault nurse examiner for a forensic examination.

Miyares argues that the trial court would have sustained a hearsay objection to this testimony because the State failed to show that B.B.'s motive in making the statements was to promote treatment rather than a criminal prosecution.[4] He relies on *State v. Carol M.D.*, 89 Wn. App. 77, 948 P.2d 837 (1997), *remanded sub nom. State v. Doggett*, 136 Wn.2d 1019, 967 P.2d 548 (1998), for the proposition that the State must present affirmative evidence that B.B. understood her statements would further diagnosis and treatment.

In that case, the defendants were charged with multiple sex offenses involving their four children, including nine-year-old M.D. *Carol M.D.*, 89 Wn. App. at 83. Relying on ER 803(a)(4), the court admitted the testimony of M.D.'s counselor, Cindy Andrews. *Id.* at 84. M.D. testified that she knew Andrews was her therapist, but did not know what Andrews was supposed to do. *Id.* at 86. The defendants argued on appeal that the State had failed to demonstrate that M.D. understood that her statements to Andrews were for medical treatment purposes. *Id.* at 84.

Division Three agreed, ruling that where a child declarant has not sought medical treatment, but makes statements to a counselor procured for her by a state social agency, the "record must *affirmatively demonstrate* the child made the

---

[4] Miyares does not contest that Dr. Bensen's testimony establishes that B.B.'s statements were reasonably relied on for treatment purposes.

statements understanding that they would further the diagnosis and possible treatment of the child's conditions." *Id.* at 86.

Miyares' reliance on *Carol M.D.* is misplaced. First, Washington courts have since recognized that it is "'not per se a requirement that the child victim understand that his or her statement was needed for treatment if the statement has other indicia of reliability.'" *In re Personal Rest. of Grasso*, 151 Wn.2d 1, 20-21, 84 P.3d 859 (2004) (quoting *Ashcraft*, 71 Wn. App. at 457). If there are other indicia of reliability or indirect evidence of corroboration, a finding that the child made statements for the purpose of receiving treatment is not necessary.

Here, the trial court found that B.B.'s statements to her aunt, her aunt's boyfriend, her grandmother, and the forensic interviewer were reliable because B.B. lacked an evident motive to lie, made her disclosures spontaneously, and had a positive relationship with Miyares. In addition to these findings, there was evidence that B.B. was extremely emotional while describing the incident to her aunt and wanted to leave the home she shared with Miyares because she had become afraid of him. Such behavioral changes constitute indirect corroboration of disclosures that support admissibility under ER 803(a)(4). *See State v. Swan,* 114 Wn.2d 613, 623, 790 P.2d 610 (1990) (child's behavior and emotional response deemed corroborative); *State v. Swanson*, 62 Wn. App. 186, 195, 813 P.2d 614 (1991) (behavioral changes and fear of defendant constitute indirect corroborative evidence).

Second, we can infer B.B.'s motive in speaking to the doctor was to obtain medical treatment. In *State v. Kilgore,* Division Two held:

> When the party is offering hearsay testimony through the medical diagnosis exception, *when the declarant has stated he or she does not know what the medical personnel to whom the statement was made does . . . the party offering the statement must affirmatively establish the declarant had a treatment motive.* Otherwise, as long as the declarant is not a very young child, courts may infer the declarant had such a motive.

107 Wn. App. 160, 184, 26 P.3d 308 (2001) (emphasis added). Our Supreme Court has affirmed that we may infer a victim's motive from testimony and the context in which an examination occurs. *Burke*, 196 Wn.2d at 741 ("[m]edical professionals often ask patients how their injuries are caused" and it is reasonable to believe that the victim understood the question "Can you tell me what happened?" as the starting point for a medical exam). Here, B.B. met with a medical doctor for a physical examination, not for the collection of forensic evidence. This context leads to only one reasonable inference—B.B. made statements to Dr. Bensen for purposes of obtaining medical treatment.

Miyares suggests that we must infer B.B.'s motives were purely forensic because Tolliver testified that "the sheriff we had talked to after everything said that we needed to take her to go get checked out." But unless a declarant's statements show that they spoke with medical professionals purely for a forensic purpose, a court may infer that the statements were made for a combination of purposes, including both medical and forensic purposes. *Williams*, 137 Wn. App. at 746-47. Here, even if B.B. had mixed motives in seeking medical treatment, the statement would still have been admissible under ER 803(a)(4). Because the trial court would likely have overruled any objection to Dr. Bensen's testimony, counsel's decision not to object was reasonable.

- 15 -

Even if the failure to object to Dr. Bensen's testimony constituted deficient performance, Miyares cannot establish prejudice. Prejudice exists if "'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Estes*, 188 Wn.2d at 458 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).

Dr. Bensen testified that B.B. told Tolliver that a male roommate had inappropriately touched her "private areas." This single statement did not prejudice Miyares because the fact that B.B. reported the misconduct to Tolliver was undisputed at trial. Miyares cannot demonstrate that the outcome of the trial would have been different had this single sentence been excluded at trial. Because he cannot demonstrate either deficient performance or prejudice, Miyares has failed to demonstrate that he received ineffective assistance of counsel.

3. Right to Present a Defense

Miyares next argues that he was denied his right to present a defense when the court excluded evidence of (1) a similar sexual assault disclosure made to B.B. by her friend, Caytlyn; (2) B.B.'s chaotic upbringing; and (3) Miyares' temperament.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense. U.S. CONST., amend. VI, XIV; WASH. CONST., art. I, § 3; *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). To determine whether the exclusion of evidence violates a defendant's constitutional right to present a defense, we engage in a two-part analysis. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019); *State v. Clark*, 187 Wn.2d 641, 648-49, 389 P.3d 462 (2017). First, we review a trial court's

- 16 -

evidentiary rulings for an abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. *Id.* at 59. Second, we determine whether such rulings violated a defendant's rights under the Sixth Amendment de novo. *Clark*, 187 Wn.2d at 648-49.

Caytlyn's Disclosure

Miyares first contends he was prevented from presenting his defense when the court precluded him from questioning B.B. about the details of a similar sexual assault disclosure made to her by her friend Caytlyn. We disagree.

The issue of Caytlyn's disclosure arose twice at trial, once during the cross examination of B.B. and again during the cross examination of Tolliver. B.B. testified that the first person she had told about Miyares touching her was her friend Caytlyn. Counsel for Miyares then asked if "prior to you telling her, had she told you that she had been touched by somebody?" to which the prosecutor objected on hearsay grounds. Miyares argued that this question was permissible to elicit "hue and cry" evidence. The court sustained the State's objection.

The trial court did not abuse its discretion in rejecting the "hue and cry" argument. That doctrine allows a *prosecutor* to introduce evidence that a victim of sexual assault made a timely report of the assault in order "to negate any inference that because the victim had failed to tell anyone she had been sexually assaulted, her later claim could not be believed." *State v. Martinez*, 196 Wn.2d 605, 610, 476 P.3d 189 (2020). The "hue and cry" doctrine would not have allowed Miyares to

elicit testimony from B.B. as to what Caytlyn had told her because Caytlyn's credibility was not at issue in this trial.

What Miyares probably intended was that he was not offering the evidence for the truth of the matter asserted but for the non-hearsay purpose of establishing B.B.'s state of mind at the time she made her disclosure to Tolliver. This became clear the second time the issue arose at trial, when Miyares was cross-examining Tolliver. Miyares asked if Tolliver was aware of Caytlyn's disclosure to B.B. and if she knew whether Caytlyn's allegations were similar to what B.B. had reported. The State objected on the grounds that what Caytlyn had told B.B. was irrelevant and constituted hearsay. During a short voir dire, Tolliver testified that she learned about Caytlyn's disclosure from the police, who told her it was similar to B.B.'s version of events. Tolliver testified, however, that B.B. had not shared any details about Caytlyn's experience with her.

The court ruled that the fact of the disclosure was admissible, because it was not being offered for the truth of the matter asserted but rather to show B.B.'s state of mind at the time of her own disclosure. The court also ruled that the details of Caytlyn's experience were inadmissible through Tolliver because, to the extent that Tolliver had any details, those details had come from the police and did in fact constitute hearsay. Miyares did not challenge this ruling and twice assured the court that he did not intend to offer the details of what had happened to Caytlyn. Miyares then elicited testimony from Tolliver, in front of the jury, that Caytlyn had disclosed to B.B. that she had been touched sexually as well.

- 18 -

We assume B.B., unlike Tolliver, had personal knowledge of the details of Caytlyn's disclosure. She, unlike Tolliver, would have been the proper witness to ask about those details. Had Miyares articulated the proper basis for admitting this evidence and made an offer of proof, the evidence may have been admissible if those details were in fact identical or substantially similar to B.B.'s disclosure. That information would have supported Miyares' argument that B.B. lied about her own experience and instead simply adopted Caytlyn's experience as her own.

But if Miyares had evidence that the two girls' experiences were similar, he made no offer of proof to that effect. We do not know what the "details" are that Miyares now claims he should have been allowed to elicit. ER 103(a)(2) provides that an evidentiary error may not be predicated on a ruling that excludes evidence unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." An offer of proof should (1) inform the court of the legal theory under which the offered evidence is admissible; (2) inform the trial court of the specific nature of the offered evidence so the court can judge its admissibility; and (3) create an adequate record for appellate review. *State v. Burnam*, 4 Wn. App. 2d 368, 377, 421 P.3d 977 (2018).

In this case, Miyares did not inform the court of the correct legal theory under which he sought to admit evidence from B.B., did not inform the trial court of the specific nature of the anticipated evidence, and did not create an adequate record for appellate review. Under these circumstances, we cannot conclude the trial court abused its discretion in sustaining the State's objection.

Next, we must assess whether the exclusion of the details of Caytlyn's disclosure violated Miyares' Sixth Amendment rights. *Clark*, 187 Wn.2d at 648-49. In assessing a constitutional challenge to a trial court's evidentiary decision, we must first determine if the evidence is at least minimally relevant. *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021). "If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence to determine if excluding the evidence violates the defendant's constitutional rights." *Jennings*, 199 Wn.2d at 63.

Miyares argues that "a detailed description of Caytlyn's disclosure to B.B." was relevant to demonstrate "B.B.'s alternative means of acquiring age-inappropriate knowledge" and would have allowed the jury to "better assess B.B.'s credibility, which was the dispositive issue in the case." But without an offer of proof as to what "detailed description" B.B. would have provided, we cannot say that Caytlyn's experience was similar to what B.B. described or that Caytlyn provided B.B. with age-inappropriate sexual information. While the fact of disclosure was minimally relevant, Miyares fails to demonstrate that the details of Caytlyn's disclosure were minimally relevant. Without this showing, there is no need to reach the balancing test set out in *Jennings*.

Miyares relies on *State v. Carver*, 37 Wn. App. 122, 678 P.2d 842 (1984) to support his argument that exclusion of B.B.'s testimony violated his right to present a "logical explanation" for her statements. *Carver*, however, is distinguishable. In that case, the defendant, who was on trial for sexually assaulting his

stepdaughters, sought to introduce evidence that his stepdaughters had been sexually abused by their grandfather and a friend. *Id.* at 123. The trial court concluded that the rape shield statute, RCW 9A.44.020, applied and excluded the evidence. *Id.* at 123-24.

On appeal, this court reversed, concluding the rape shield statute did not apply because the defendant had not offered the evidence to attack the victims' character but to "to rebut the inference they would not know about such sexual acts unless they had experienced them with the defendant." 37 Wn. App. at 124. The court concluded that excluding this evidence "unfairly curtailed defendant's ability to present a logical explanation for the victims' testimony." *Id.* at 125.

Here, Miyares was able to present a logical explanation for B.B.'s testimony. The court permitted Miyares to present evidence that Caytlyn disclosed to B.B. that she had been the victim of sexual touching by permitting Tolliver to testify to this fact. And he was able to use that testimony to argue to the jury that B.B. was just trying to "copycat" what she heard from Caytlyn. Unlike *Carver*, the court's ruling limiting Miyares' cross examination of B.B. did not prevent Miyares from presenting his theory of the case because he was able to elicit the evidence he sought to introduce through Tolliver.

B.B.'s "Chaotic" Upbringing

Next, Miyares argues the trial court erred in preventing him from presenting evidence of B.B.'s upbringing, which he contends would have provided an alternative explanation of B.B.'s sexual knowledge.

At the pre-trial child hearsay hearing, Tolliver testified that both of B.B.'s parents struggled with drug addiction, B.B.'s father died of an asthma attack when she was three years old and, at the time of trial, B.B.'s mother was in prison. Tolliver also stated that the State had removed B.B. from her mother twice, resulting in a changing and "traumatic living situation." Tolliver testified that she "knew the circumstances [B.B.] was in and what she was going through" but did not know B.B.'s day-to-day life.

Tolliver repeated this testimony at trial. She explained that, beyond the general circumstances of B.B.'s living situation, she did not know details about B.B.'s daily life while living with her parents. Miyares then asked "I think it's safe to assume that [B.B.] saw a lot of things that maybe young children shouldn't see; is that correct?" The trial court sustained the State's objection to this question as calling for speculation.

The trial court did not abuse its discretion in sustaining this evidentiary objection. Pursuant to ER 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The only evidence before the trial court demonstrated that Tolliver was unaware of B.B.'s daily activities when she lived with her biological parents. Therefore, any testimony that B.B. may have been exposed to things "young children should not see" would have been speculation. It is similarly speculative to suggest that B.B.'s parents exposed her to inappropriate *sexual* information. While there was evidence they had drug addictions, Miyares made

no offer of proof that the parents engaged in sexual conduct in front of B.B. or exposed her to age-inappropriate sexual information.

Nor did the trial court infringe Miyares' right to present a defense in excluding this testimony. Speculative testimony is not relevant. *State v. Dixon*, 159 Wn.2d 65, 79, 147 P.3d 991 (2006). Defendants have no constitutional right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Because information from a witness who lacks personal knowledge is not relevant, the court did not infringe Miyares' right to present a defense by sustaining the State's objection to this line of questioning of Tolliver.

<u>Miyares' Temperament</u>

Finally, Miyares argues the trial court erred in preventing Hoyt from testifying about Miyares' temperament—evidence he contends was admissible under ER 404(a)(1) and ER 405. We again disagree.

Under ER 404(a), "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." ER 404(a)(1) provides an exception to this rule for "[e]vidence of a pertinent trait of character offered by an accused." Admissible character evidence may be presented through "testimony as to reputation." ER 405(a). To offer reputation evidence, the defendant must be able to lay a foundation showing that the evidence is "based on perceptions in the community," rather than the witness's personal opinion. *State v. Thach*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d 657, 466 P.3d 799 (2020). "To establish a valid community, the party seeking to admit the

reputation evidence must show that the community is both neutral and general."
*State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993).

At trial, Miyares asked Hoyt, his former girlfriend, to describe his temperament for the jury. In responding to the State's ER 404 objection, Miyares clarified that he was seeking "[a] description of the defendant as a person. It is not offered for a defense in the case. . . . What I'm trying to do is create the response in the witness concerning his deportment, his demeanor, what type of person he is." The trial court sustained the objection, concluding

> It is character evidence. This witness cannot testify generally to this defendant's general character. . . .

> It's just a general testimony about his general character, which is not by way of reputation, because this witness by herself does not rise to the level of a community for which reputation testimony would be admissible.

This was not an abuse of discretion.

Miyares failed to present any argument that Hoyt was a member of neutral or generalized community and presented no evidence suggesting that Hoyt had knowledge of Miyares' reputation in that community. Hoyt's testimony regarding Miyares' temperament was inadmissible because it did not establish Miyares' reputation as required by the rules of evidence. The trial court did not err in sustaining the State's objection to this evidence.

Nor did the exclusion of this evidence infringe Miyares' right to present a defense. Evidence of a defendant's general character is irrelevant, as it does not make his guilt of child molestation any more or less probable. *See State v. Perez-Valdez*, 172 Wn.2d 808, 820, 265 P.3d 853 (2011) (noting that the State "correctly

argued that a general reputation for good character is not pertinent under ER 404(a)(1) to a specific element of . . . rape of a child."); *State v. Griswold*, 98 Wn. App. 817, 829, 991 P.2d 657 (2000), *abrogated on other grounds by State v. DeVincentis*, 150 Wn.2d 11, 74 P.3d 119 (2003) (general moral character is not specifically pertinent to a child molestation charge).  One person's opinion about Miyares' temperament is irrelevant to whether he molested a seven-year-old girl.

Because testimony by Hoyt concerning Miyares's general character was not admissible, Miyares was not denied his right to present a defense.

4.  Cumulative Error

Finally, Miyares argues that the cumulative effect of the challenged errors deprived him of his right to a fair trial.  The cumulative error doctrine requires reversal when the combined effect of several errors denies the defendant a fair trial.  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." *Id.*  Because Miyares cannot show that multiple errors deprived him his right to fair trial, his cumulative error claim fails.

We affirm.

Andrus, C.J.

WE CONCUR:

Birk, J.                              Bremner, J

- 25 -